(Slip Opinion)     OCTOBER TERM, 2019     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## McGIRT *v*. OKLAHOMA

### CERTIORARI TO THE COURT OF CRIMINAL APPEALS OF OKLAHOMA

No. 18–9526.   Argued May 11, 2020—Decided July 9, 2020

The Major Crimes Act (MCA) provides that, within "the Indian country," "[a]ny Indian who commits" certain enumerated offenses "shall be subject to the same law and penalties as all other persons committing any of [those] offenses, within the exclusive jurisdiction of the United States."   18 U. S. C. §1153(a).   "Indian country" includes "all land within the limits of any Indian reservation under the jurisdiction of the United States Government."  §1151.   Petitioner Jimcy McGirt was convicted by an Oklahoma state court of three serious sexual offenses. He unsuccessfully argued in state postconviction proceedings that the State lacked jurisdiction to prosecute him because he is an enrolled member of the Seminole Nation and his crimes took place on the Creek Reservation.  He seeks a new trial, which, he contends, must take place in federal court.

*Held*: For MCA purposes, land reserved for the Creek Nation since the 19th century remains "Indian country."  Pp. 3–42.

   (a) Congress established a reservation for the Creek Nation.  An 1833 Treaty fixed borders for a "permanent home to the whole Creek Nation of Indians," 7 Stat. 418, and promised that the United States would "grant a patent, in fee simple, to the Creek nation of Indians for the [assigned] land" to continue "so long as they shall exist as a nation, and continue to occupy the country hereby assigned to them," *id.*, at 419.  The patent formally issued in 1852.

   Though the early treaties did not refer to the Creek lands as a "reservation," similar language in treaties from the same era has been held sufficient to create a reservation, see, *e.g.*, *Menominee Tribe* v. *United States,* 391 U. S. 404, 405, and later Acts of Congress—referring to the "Creek reservation"—leave no room for doubt, see, *e.g.*, 17 Stat. 626. In addition, an 1856 Treaty promised that "no portion" of Creek lands

"would ever be embraced or included within, or annexed to, any Territory or State," 11 Stat. 700, and that the Creeks would have the "unrestricted right of self-government," with "full jurisdiction" over enrolled Tribe members and their property, *id.*, at 704. Pp. 3–6.

  (b) Congress has since broken more than a few promises to the Tribe. Nevertheless, the Creek Reservation persists today. Pp. 6–28.

    (1) Once a federal reservation is established, only Congress can diminish or disestablish it. Doing so requires a clear expression of congressional intent. Pp. 6–8.

    (2) Oklahoma claims that Congress ended the Creek Reservation during the so-called "allotment era"—a period when Congress sought to pressure many tribes to abandon their communal lifestyles and parcel their lands into smaller lots owned by individual tribal members. Missing from the allotment-era agreement with the Creek, see 31 Stat. 862–864, however, is any statute evincing anything like the "present and total surrender of all tribal interests" in the affected lands. And this Court has already rejected the argument that allotments automatically ended reservations. Pp. 8–13.

    (3) Oklahoma points to other ways Congress intruded on the Creeks' promised right to self-governance during the allotment era, including abolishing the Creeks' tribal courts, 30 Stat. 504–505, and requiring Presidential approval for certain tribal ordinances, 31 Stat. 872. But these laws fall short of eliminating all tribal interest in the contested lands. Pp. 13–17.

    (4) Oklahoma ultimately claims that historical practice and demographics are enough by themselves to prove disestablishment. This Court has consulted contemporaneous usages, customs, and practices to the extent they shed light on the meaning of ambiguous statutory terms, but Oklahoma points to no ambiguous language in any of the relevant statutes that could plausibly be read as an act of cession. Such extratextual considerations are of "'limited interpretive value,'" *Nebraska* v. *Parker*, 577 U. S. 481, ___, and the "least compelling" form of evidence, *South Dakota* v. *Yankton Sioux Tribe*, 522 U. S. 329, 356. In the end, Oklahoma resorts to the State's long historical practice of prosecuting Indians in state court for serious crimes on the contested lands, various statements made during the allotment era, and the speedy and persistent movement of white settlers into the area. But these supply little help with the law's meaning and much potential for mischief. Pp. 17–28.

  (c) In the alternative, Oklahoma contends that Congress never established a reservation but instead created a "dependent Indian community." To hold that the Creek never had a reservation would require willful blindness to the statutory language and a belief that the land

patent the Creek received somehow made their tribal sovereignty easier to divest. Congress established a reservation, not a dependent Indian community, for the Creek Nation. Pp. 28–31.

(d) Even assuming that the Creek land is a reservation, Oklahoma argues that the MCA has never applied in eastern Oklahoma. It claims that the Oklahoma Enabling Act, which transferred all non-federal cases pending in the territorial courts to Oklahoma's state courts, made the State's courts the successors to the federal territorial courts' sweeping authority to try Indians for crimes committed on reservations. That argument, however, rests on state prosecutorial practices that defy the MCA, rather than on the law's plain terms. Pp. 32–36.

(e) Finally, Oklahoma warns of the potential consequences that will follow a ruling against it, such as unsettling an untold number of convictions and frustrating the State's ability to prosecute crimes in the future. This Court is aware of the potential for cost and conflict around jurisdictional boundaries. But Oklahoma and its tribes have proven time and again that they can work successfully together as partners, and Congress remains free to supplement its statutory directions about the lands in question at any time. Pp. 36–42.

Reversed.

GORSUCH, J., delivered the opinion of the Court, in which GINSBURG, BREYER, SOTOMAYOR, and KAGAN, JJ., joined. ROBERTS, C. J., filed a dissenting opinion, in which ALITO and KAVANAUGH, JJ., joined, and in which THOMAS, J., joined, except as to footnote 9. THOMAS, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 18–9526

### JIMCY McGIRT, PETITIONER *v.* OKLAHOMA

ON WRIT OF CERTIORARI TO THE COURT OF CRIMINAL
APPEALS OF OKLAHOMA

[July 9, 2020]

JUSTICE GORSUCH delivered the opinion of the Court.

On the far end of the Trail of Tears was a promise. Forced to leave their ancestral lands in Georgia and Alabama, the Creek Nation received assurances that their new lands in the West would be secure forever. In exchange for ceding "all their land, East of the Mississippi river," the U. S. government agreed by treaty that "[t]he Creek country west of the Mississippi shall be solemnly guarantied to the Creek Indians." Treaty With the Creeks, Arts. I, XIV, Mar. 24, 1832, 7 Stat. 366, 368 (1832 Treaty). Both parties settled on boundary lines for a new and "permanent home to the whole Creek nation," located in what is now Oklahoma. Treaty With the Creeks, preamble, Feb. 14, 1833, 7 Stat. 418 (1833 Treaty). The government further promised that "[no] State or Territory [shall] ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves." 1832 Treaty, Art. XIV, 7 Stat. 368.

Today we are asked whether the land these treaties promised remains an Indian reservation for purposes of federal criminal law. Because Congress has not said otherwise, we hold the government to its word.

## I

At one level, the question before us concerns Jimcy McGirt. Years ago, an Oklahoma state court convicted him of three serious sexual offenses. Since then, he has argued in postconviction proceedings that the State lacked jurisdiction to prosecute him because he is an enrolled member of the Seminole Nation of Oklahoma and his crimes took place on the Creek Reservation. A new trial for his conduct, he has contended, must take place in federal court. The Oklahoma state courts hearing Mr. McGirt's arguments rejected them, so he now brings them here.

Mr. McGirt's appeal rests on the federal Major Crimes Act (MCA). The statute provides that, within "the Indian country," "[a]ny Indian who commits" certain enumerated offenses "against the person or property of another Indian or any other person" "shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." 18 U. S. C. §1153(a). By subjecting Indians to federal trials for crimes committed on tribal lands, Congress may have breached its promises to tribes like the Creek that they would be free to govern themselves. But this particular incursion has its limits—applying only to certain enumerated crimes and allowing only the federal government to try Indians. State courts generally have no jurisdiction to try Indians for conduct committed in "Indian country." *Negonsott* v. *Samuels*, 507 U. S. 99, 102–103 (1993).

The key question Mr. McGirt faces concerns that last qualification: Did he commit his crimes in Indian country? A neighboring provision of the MCA defines the term to include, among other things, "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." §1151(a). Mr. McGirt submits he can satisfy

this condition because he committed his crimes on land reserved for the Creek since the 19th century.

The Creek Nation has joined Mr. McGirt as *amicus curiae*. Not because the Tribe is interested in shielding Mr. McGirt from responsibility for his crimes. Instead, the Creek Nation participates because Mr. McGirt's personal interests wind up implicating the Tribe's. No one disputes that Mr. McGirt's crimes were committed on lands described as the Creek Reservation in an 1866 treaty and federal statute. But, in seeking to defend the state-court judgment below, Oklahoma has put aside whatever procedural defenses it might have and asked us to confirm that the land once given to the Creeks is no longer a reservation today.

At another level, then, Mr. McGirt's case winds up as a contest between State and Tribe. The scope of their dispute is limited; nothing we might say today could unsettle Oklahoma's authority to try non-Indians for crimes against non-Indians on the lands in question. See *United States* v. *McBratney*, 104 U. S. 621, 624 (1882). Still, the stakes are not insignificant. If Mr. McGirt and the Tribe are right, the State has no right to prosecute Indians for crimes committed in a portion of Northeastern Oklahoma that includes most of the city of Tulsa. Responsibility to try these matters would fall instead to the federal government and Tribe. Recently, the question has taken on more salience too. While Oklahoma state courts have rejected any suggestion that the lands in question remain a reservation, the Tenth Circuit has reached the opposite conclusion. *Murphy* v. *Royal*, 875 F. 3d 896, 907–909, 966 (2017). We granted certiorari to settle the question. 589 U. S. \_\_\_ (2019).

## II

Start with what should be obvious: Congress established a reservation for the Creeks. In a series of treaties, Con-

gress not only "solemnly guarantied" the land but also "establish[ed] boundary lines which will secure a country and permanent home to the whole Creek Nation of Indians." 1832 Treaty, Art. XIV, 7 Stat. 368; 1833 Treaty, preamble, 7 Stat. 418. The government's promises weren't made gratuitously. Rather, the 1832 Treaty acknowledged that "[t]he United States are desirous that the Creeks should remove to the country west of the Mississippi" and, in service of that goal, required the Creeks to cede all lands in the East. Arts. I, XII, 7 Stat. 366, 367. Nor were the government's promises meant to be delusory. Congress twice assured the Creeks that "[the] Treaty shall be obligatory on the contracting parties, as soon as the same shall be ratified by the United States." 1832 Treaty, Art. XV, *id.*, at 368; see 1833 Treaty, Art. IX, 7 Stat. 420 ("agreement shall be binding and obligatory" upon ratification). Both treaties were duly ratified and enacted as law.

Because the Tribe's move west was ostensibly voluntary, Congress held out another assurance as well. In the statute that precipitated these negotiations, Congress authorized the President "to assure the tribe . . . that the United States will forever secure and guaranty to them . . . the country so exchanged with them." Indian Removal Act of 1830, §3, 4 Stat. 412. "[A]nd if they prefer it," the bill continued, "the United States will cause a patent or grant to be made and executed to them for the same; *Provided always*, that such lands shall revert to the United States, if the Indians become extinct, or abandon the same." *Ibid.* If agreeable to all sides, a tribe would not only enjoy the government's solemn treaty promises; it would hold legal title to its lands.

It was an offer the Creek accepted. The 1833 Treaty fixed borders for what was to be a "permanent home to the whole Creek nation of Indians." 1833 Treaty, preamble, 7 Stat. 418. It also established that the "United States will grant a patent, in fee simple, to the Creek nation of Indians for the land assigned said nation by this treaty." Art. III, *id.*,

at 419. That grant came with the caveat that "the right thus guaranteed by the United States shall be continued to said tribe of Indians, so long as they shall exist as a nation, and continue to occupy the country hereby assigned to them." *Ibid.* The promised patent formally issued in 1852. See *Woodward* v. *De Graffenried*, 238 U. S. 284, 293–294 (1915).

These early treaties did not refer to the Creek lands as a "reservation"—perhaps because that word had not yet acquired such distinctive significance in federal Indian law. But we have found similar language in treaties from the same era sufficient to create a reservation. See *Menominee Tribe* v. *United States*, 391 U. S. 404, 405 (1968) (grant of land "'for a home, to be held as Indian lands are held,'" established a reservation). And later Acts of Congress left no room for doubt. In 1866, the United States entered yet another treaty with the Creek Nation. This agreement reduced the size of the land set aside for the Creek, compensating the Tribe at a price of 30 cents an acre. Treaty Between the United States and the Creek Nation of Indians, Art. III, June 14, 1866, 14 Stat. 786. But Congress explicitly restated its commitment that the remaining land would "be forever set apart as a home for said Creek Nation," which it now referred to as "the reduced Creek reservation." Arts. III, IX, *id.*, at 786, 788.[1] Throughout the late

———————

[1] The dissent by THE CHIEF JUSTICE (hereinafter the dissent) suggests that the Creek's intervening alliance with the Confederacy "'unsettled'" and "'forfeit[ed]'" the longstanding promises of the United States. *Post,* at 3. But the Treaty of 1866 put an end to any Civil War hostility, promising mutual amnesty, "perpetual peace and friendship," and guaranteeing the Tribe the "quiet possession of their country." Art. I, 14 Stat. 786. Though this treaty expressly reduced the size of the Creek Reservation, the Creek were compensated for the lost territory, and otherwise "retained" their unceded portion. Art. III, *ibid.* Contrary to the dissent's implication, nothing in the Treaty of 1866 purported to repeal prior treaty promises. Cf. Art. XII, *id.,* at 790 (the United States expressly "reaffirms and reassumes all obligations of treaty stipulations with the

19th century, many other federal laws also expressly re-ferred to the Creek Reservation. See, *e.g.,* Treaty Between United States and Cherokee Nation of Indians, Art. IV, July 19, 1866, 14 Stat. 800 ("Creek reservation"); Act of Mar. 3, 1873, ch. 322, 17 Stat. 626; (multiple references to the "Creek reservation" and "Creek India[n] Reservation"); 11 Cong. Rec. 2351 (1881) (discussing "the dividing line be-tween the Creek reservation and their ceded lands"); Act of Feb. 13, 1891, 26 Stat. 750 (describing a cession by refer-encing the "West boundary line of the Creek Reservation").

There is a final set of assurances that bear mention, too. In the Treaty of 1856, Congress promised that "no portion" of the Creek Reservation "shall ever be embraced or in-cluded within, or annexed to, any Territory or State." Art. IV, 11 Stat. 700. And within their lands, with exceptions, the Creeks were to be "secured in the unrestricted right of self-government," with "full jurisdiction" over enrolled Tribe members and their property. Art. XV, *id.*, at 704. So the Creek were promised not only a "permanent home" that would be "forever set apart"; they were also assured a right to self-government on lands that would lie outside both the legal jurisdiction and geographic boundaries of any State. Under any definition, this was a reservation.

## III

### A

While there can be no question that Congress established a reservation for the Creek Nation, it's equally clear that Congress has since broken more than a few of its promises to the Tribe. Not least, the land described in the parties' treaties, once undivided and held by the Tribe, is now frac-tured into pieces. While these pieces were initially distrib-uted to Tribe members, many were sold and now belong to persons unaffiliated with the Nation. So in what sense, if

————————
Creek nation entered into before" the Civil War).

any, can we say that the Creek Reservation persists today?

To determine whether a tribe continues to hold a reservation, there is only one place we may look: the Acts of Congress. This Court long ago held that the Legislature wields significant constitutional authority when it comes to tribal relations, possessing even the authority to breach its own promises and treaties. *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 566–568 (1903). But that power, this Court has cautioned, belongs to Congress alone. Nor will this Court lightly infer such a breach once Congress has established a reservation. *Solem* v. *Bartlett*, 465 U. S. 463, 470 (1984).

Under our Constitution, States have no authority to reduce federal reservations lying within their borders. Just imagine if they did. A State could encroach on the tribal boundaries or legal rights Congress provided, and, with enough time and patience, nullify the promises made in the name of the United States. That would be at odds with the Constitution, which entrusts Congress with the authority to regulate commerce with Native Americans, and directs that federal treaties and statutes are the "supreme Law of the Land." Art. I, §8; Art. VI, cl. 2. It would also leave tribal rights in the hands of the very neighbors who might be least inclined to respect them.

Likewise, courts have no proper role in the adjustment of reservation borders. Mustering the broad social consensus required to pass new legislation is a deliberately hard business under our Constitution. Faced with this daunting task, Congress sometimes might wish an inconvenient reservation would simply disappear. Short of that, legislators might seek to pass laws that tiptoe to the edge of disestablishment and hope that judges—facing no possibility of electoral consequences themselves—will deliver the final push. But wishes don't make for laws, and saving the political branches the embarrassment of disestablishing a reservation is not one of our constitutionally assigned prerogatives. "[O]nly Congress can divest a reservation of its land and

diminish its boundaries." *Solem*, 465 U. S., at 470. So it's no matter how many other promises to a tribe the federal government has already broken. If Congress wishes to break the promise of a reservation, it must say so.

History shows that Congress knows how to withdraw a reservation when it can muster the will. Sometimes, legislation has provided an "[e]xplicit reference to cession" or an "unconditional commitment . . . to compensate the Indian tribe for its opened land." *Ibid.* Other times, Congress has directed that tribal lands shall be "'restored to the public domain.'" *Hagen* v. *Utah*, 510 U. S. 399, 412 (1994) (emphasis deleted). Likewise, Congress might speak of a reservation as being "'discontinued,'" "'abolished,'" or "'vacated.'" *Mattz* v. *Arnett*, 412 U. S. 481, 504, n. 22 (1973). Disestablishment has "never required any particular form of words," *Hagen*, 510 U. S., at 411. But it does require that Congress clearly express its intent to do so, "[c]ommon[ly with an] '[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests.'" *Nebraska* v. *Parker*, 577 U. S. 481, ___–___ (2016) (slip op., at 6).

B

In an effort to show Congress has done just that with the Creek Reservation, Oklahoma points to events during the so-called "allotment era." Starting in the 1880s, Congress sought to pressure many tribes to abandon their communal lifestyles and parcel their lands into smaller lots owned by individual tribe members. See 1 F. Cohen, Handbook of Federal Indian Law §1.04 (2012) (Cohen), discussing General Allotment Act of 1887, ch. 119, 24 Stat. 388. Some allotment advocates hoped that the policy would create a class of assimilated, landowning, agrarian Native Americans. See Cohen §1.04; F. Hoxie, A Final Promise: The Campaign To Assimilate 18–19 (2001). Others may have hoped that, with lands in individual hands and (eventually)

freely alienable, white settlers would have more space of their own. See *id.*, at 14–15; cf. General Allotment Act of 1887, §5, 24 Stat. 389–390.

The Creek were hardly exempt from the pressures of the allotment era. In 1893, Congress charged the Dawes Commission with negotiating changes to the Creek Reservation. Congress identified two goals: Either persuade the Creek to cede territory to the United States, as it had before, or agree to allot its lands to Tribe members. Act of Mar. 3, 1893, ch. 209, §16, 27 Stat. 645–646. A year later, the Commission reported back that the Tribe "would not, under any circumstances, agree to cede any portion of their lands." S. Misc. Doc. No. 24, 53d Cong., 3d Sess., 7 (1894). At that time, before this Court's decision in *Lone Wolf*, Congress may not have been entirely sure of its power to terminate an established reservation unilaterally. Perhaps for that reason, perhaps for others, the Commission and Congress took this report seriously and turned their attention to allotment rather than cession.[2]

The Commission's work culminated in an allotment agreement with the Tribe in 1901. Creek Allotment Agreement, ch. 676, 31 Stat. 861. With exceptions for certain pre-existing town sites and other special matters, the Agreement established procedures for allotting 160-acre parcels to individual Tribe members who could not sell, transfer, or otherwise encumber their allotments for a number of years. §§3, 7, *id.*, at 862–864 (5 years for any portion, 21 years for the designated "homestead" portion). Tribe members were given deeds for their parcels that "convey[ed] to [them] all right, title, and interest of the Creek Nation." §23, *id.*, at

———————

[2] The dissent stresses, repeatedly, that the Dawes Commission was charged with seeking to extinguish the reservation. *Post,* at 18, 24. Yet, the dissent fails to mention the Commission's various reports acknowledging that those efforts were unsuccessful precisely because the Creek refused to cede their lands.

867–868.  In 1908, Congress relaxed these alienation re-
strictions in some ways, and even allowed the Secretary of
the Interior to waive them.  Act of May 27, 1908, ch. 199,
§1, 35 Stat. 312.  One way or the other, individual Tribe
members were eventually free to sell their land to Indians
and non-Indians alike.

Missing in all this, however, is a statute evincing any-
thing like the "present and total surrender of all tribal in-
terests" in the affected lands.  Without doubt, in 1832 the
Creek "cede[d]" their original homelands east of the Missis-
sippi for a reservation promised in what is now Oklahoma.
1832 Treaty, Art. I, 7 Stat. 366.  And in 1866, they "cede[d]
and convey[ed]" a portion of that reservation to the United
States.  Treaty With the Creek, Art. III, 14 Stat. 786.  But
because there exists no equivalent law terminating what
remained, the Creek Reservation survived allotment.

In saying this we say nothing new.  For years, States have
sought to suggest that allotments automatically ended res-
ervations, and for years courts have rejected the argument.
Remember, Congress has defined "Indian country" to in-
clude "all land within the limits of any Indian reservation
. . . notwithstanding the issuance of any patent, and, includ-
ing any rights-of-way running through the reservation."  18
U. S. C. §1151(a).  So the relevant statute expressly contem-
plates private land ownership within reservation bounda-
ries.  Nor under the statute's terms does it matter whether
these individual parcels have passed hands to non-Indians.
To the contrary, this Court has explained repeatedly that
Congress does not disestablish a reservation simply by al-
lowing the transfer of individual plots, whether to Native
Americans or others.  See *Mattz*, 412 U. S., at 497 ("[A]llot-
ment under the . . . Act is completely consistent with con-
tinued reservation status"); *Seymour* v. *Superintendent of
Wash. State Penitentiary*, 368 U. S. 351, 356–358 (1962)
(holding that allotment act "did no more than open the way
for non-Indian settlers to own land on the reservation");

*Parker*, 577 U. S., at \_\_\_ (slip op., at 7) ("[T]he 1882 Act falls into another category of surplus land Acts: those that merely opened reservation land to settlement. . . . Such schemes allow non-Indian settlers to own land on the reservation" (internal quotation marks omitted)).

It isn't so hard to see why. The federal government issued its own land patents to many homesteaders throughout the West. These patents transferred legal title and are the basis for much of the private land ownership in a number of States today. But no one thinks any of this diminished the United States's claim to sovereignty over any land. To accomplish that would require an act of cession, the transfer of a sovereign claim from one nation to another. 3 E. Washburn, American Law of Real Property *521–*524. And there is no reason why Congress cannot reserve land for tribes in much the same way, allowing them to continue to exercise governmental functions over land even if they no longer own it communally. Indeed, such an arrangement seems to be contemplated by §1151(a)'s plain terms. Cf. *Seymour*, 368 U. S., at 357–358.[3]

Oklahoma reminds us that allotment was often the first step in a plan ultimately aimed at disestablishment. As this Court explained in *Mattz*, Congress's expressed policy at the time "was to continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing." 412 U. S., at 496. Then, "[w]hen all the lands had been allotted and the trust expired, the reservation could be abolished." *Ibid.* This plan was set in motion nationally in the General Allotment

---

[3] The dissent not only fails to acknowledge these features of the statute and our precedents. It proceeds in defiance of them, suggesting that by moving to eliminate communal title and relaxing restrictions on alienation, "Congress destroyed the foundation of [the Creek Nation's] sovereignty." *Post*, at 18–19. But this Court long ago rejected the notion that the purchase of lands by non-Indians is inconsistent with reservation status. See *Seymour*, 368 U. S., at 357–358.

Act of 1887, and for the Creek specifically in 1901. No doubt, this is why Congress at the turn of the 20th century "believed to a man" that "the reservation system would cease" "within a generation at most." *Solem*, 465 U. S., at 468. Still, just as wishes are not laws, future plans aren't either. Congress may have passed allotment laws to create the conditions for disestablishment. But to equate allotment with disestablishment would confuse the first step of a march with arrival at its destination.[4]

Ignoring this distinction would run roughshod over many other statutes as well. In some cases, Congress chose not to wait for allotment to run its course before disestablishing a reservation. When it deemed that approach appropriate, Congress included additional language expressly ending reservation status. So, for example, in 1904, Congress allotted reservations belonging to the Ponca and Otoe Tribes, reservations also lying within modern-day Oklahoma, and then provided "further, That the reservation lines of the said . . . reservations . . . are hereby abolished." Act of Apr. 21, 1904, §8, 33 Stat. 217–218 (emphasis deleted); see also *DeCoteau* v. *District County Court for Tenth Judicial Dist.*, 420 U. S. 425, 439–440, n. 22 (1975) (collecting other examples). Tellingly, however, nothing like that can be found in the nearly contemporary 1901 Creek Allotment Agreement or the 1908 Act. That doesn't make these laws special. Rather, in using the language that they did, these allotment laws tracked others of the period, parceling out individual

——————
[4] The dissent seemingly conflates these steps in other ways, too, by implying that the passage of an allotment Act *itself* extinguished title. *Post,* at 18–19. The reality proved more complicated. Allotment of the Creek lands did not occur overnight, but dragged on for years, well past Oklahoma's statehood, until Congress finally prohibited any further allotments more than 15 years later. Act of Mar. 2, 1917, 39 Stat. 986.

tracts, while saving the ultimate fate of the land's reservation status for another day.[5]

## C

If allotment by itself won't work, Oklahoma seeks to prove disestablishment by pointing to other ways Congress intruded on the Creek's promised right to self-governance during the allotment era. It turns out there were many. For example, just a few years before the 1901 Creek Allotment Agreement, and perhaps in an effort to pressure the Tribe to the negotiating table, Congress abolished the Creeks' tribal courts and transferred all pending civil and criminal cases to the U. S. Courts of the Indian Territory. Curtis Act of 1898, §28, 30 Stat. 504–505. Separately, the Creek Allotment Agreement provided that tribal ordinances "affecting the lands of the Tribe, or of individuals after allotment, or the moneys or other property of the Tribe, or of the citizens thereof" would not be valid until approved by the President of the United States. §42, 31 Stat. 872.

Plainly, these laws represented serious blows to the

––––––––––

[5] The dissent doesn't purport to find any of the hallmarks of diminishment in the Creek Allotment Agreement. Instead, the dissent tries to excuse their absence by saying that it would have made "little sense" to find such language in an Act transferring the Tribe's lands to private owners. *Post*, at 14. But the dissent's account is impossible to reconcile with history and precedent. As we have noted, plenty of allotment agreements during this era included precisely the language of cession and compensation that the dissent says it would make "little sense" to find there. And this Court has confirmed time and again that allotment agreements without such language do not necessarily disestablish or diminish the reservation at issue. See *Mattz* v. *Arnett*, 412 U. S. 481, 497 (1973); *Seymour* v. *Superintendent* of *Wash. State Penitentiary*, 368 U. S. 351, 358 (1962). The dissent's only answer is to suggest that allotment combined with *other* statutes limiting the Creek Nation's governing authority amounted to disestablishment—in other words that it's the arguments in the *next* section that really do the work.

Creek. But, just as plainly, they left the Tribe with significant sovereign functions over the lands in question. For example, the Creek Nation retained the power to collect taxes, operate schools, legislate through tribal ordinances, and, soon, oversee the federally mandated allotment process. §§39, 40, 42, *id.*, at 871–872; *Buster* v. *Wright*, 135 F. 947, 949–950, 953–954 (CA8 1905). And, in its own way, the congressional incursion on tribal legislative processes only served to prove the power: Congress would have had no need to subject tribal legislation to Presidential review if the Tribe lacked any authority to legislate. Grave though they were, these congressional intrusions on pre-existing treaty rights fell short of eliminating all tribal interests in the land.

Much more ominously, the 1901 allotment agreement ended by announcing that the Creek tribal government "shall not continue" past 1906, although the agreement quickly qualified that statement, adding the proviso "subject to such further legislation as Congress may deem proper." §46, 31 Stat. 872. Thus, while suggesting that the tribal government *might* end in 1906, Congress also necessarily understood it had not ended in 1901. All of which was consistent with the Legislature's general practice of taking allotment as a first, not final, step toward disestablishment and dissolution.

When 1906 finally arrived, Congress adopted the Five Civilized Tribes Act. But instead of dissolving the tribal government as some may have expected, Congress "deem[ed] proper" a different course, simply cutting away further at the Tribe's autonomy. Congress empowered the President to remove and replace the principal chief of the Creek, prohibited the tribal council from meeting more than 30 days a year, and directed the Secretary of the Interior to assume control of tribal schools. §§6, 10, 28, 34 Stat. 139–140, 148. The Act also provided for the handling of the

Tribe's funds, land, and legal liabilities in the event of dissolution. §§11, 27, *id.*, at 141, 148. Despite these additional incursions on tribal authority, however, Congress expressly recognized the Creek's "tribal existence and present tribal governmen[t]" and "continued [them] in full force and effect for all purposes authorized by law." §28, *id.*, at 148.

In the years that followed, Congress continued to adjust its arrangements with the Tribe. For example, in 1908, the Legislature required Creek officials to turn over all "tribal properties" to the Secretary of the Interior. Act of May 27, 1908, §13, 35 Stat. 316. The next year, Congress sought the Creek National Council's release of certain money claims against the U. S. government. Act of Mar. 3, 1909, ch. 263, 35 Stat. 781, 805. And, further still, Congress offered the Creek Nation a one-time opportunity to file suit in the federal Court of Claims for "any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and the Creek Indian Nation." Act of May 24, 1924, ch. 181, 43 Stat. 139; see, *e.g., United States* v. *Creek Nation*, 295 U. S. 103 (1935). But Congress never withdrew its recognition of the tribal government, and none of its adjustments would have made any sense if Congress thought it had already completed that job.

Indeed, with time, Congress changed course completely. Beginning in the 1920s, the federal outlook toward Native Americans shifted "away from assimilation policies and toward more tolerance and respect for traditional aspects of Indian culture." 1 Cohen §1.05. Few in 1900 might have foreseen such a profound "reversal of attitude" was in the making or expected that "new protections for Indian rights," including renewed "support for federally defined tribalism," lurked around the corner. *Ibid.*; see also M. Scherer, Imperfect Victories: The Legal Tenacity of the Omaha Tribe, 1945–1995, pp. 2–4 (1999). But that is exactly what happened. Pursuant to this new national policy,

in 1936, Congress authorized the Creek to adopt a constitution and bylaws, see Act of June 26, 1936, §3, 49 Stat. 1967, enabling the Creek government to resume many of its previously suspended functions. *Muscogee (Creek) Nation* v. *Hodel*, 851 F. 2d 1439, 1442–1447 (CADC 1988).[6]

The Creek Nation has done exactly that. In the intervening years, it has ratified a new constitution and established three separate branches of government. *Ibid.*; see Muscogee Creek Nation (MCN) Const., Arts. V, VI, and VII. Today the Nation is led by a democratically elected Principal Chief, Second Chief, and National Council; operates a police force and three hospitals; commands an annual budget of more than $350 million; and employs over 2,000 people. Brief for Muscogee (Creek) Nation as *Amicus Curiae* 36–39. In 1982, the Nation passed an ordinance reestablishing the criminal and civil jurisdiction of its courts. See *Hodel*, 851 F. 2d, at 1442, 1446–1447 (confirming Tribe's authority to do so). The territorial jurisdiction of these courts extends to any Indian country within the Tribe's territory as defined by the Treaty of 1866. MCN Stat. 27, §1–102(A). And the State of Oklahoma has afforded full faith and credit to its judgments since at least 1994. See *Barrett* v. *Barrett*, 878

———————

[6] The dissent calls it "fantasy" to suggest that Congress evinced "any unease about extinguishing the Creek domain" because Congress "did what it set out to do: transform a reservation into a State." *Post,* at 22–23. The dissent stresses, too, that the Creek were afforded U. S. citizenship and the right to vote. *Post,* at 20. But the only thing implausible here is the suggestion that "creat[ing] a new State" or enfranchising Native Americans implies an "intent to terminate" any and all reservations within a State's boundaries. *Post,* at 15. This Court confronted—and rejected—that sort of argument long ago in *United States* v. *Sandoval*, 231 U. S. 28, 47–48 (1913). The dissent treats that case as a one-off: special because "the tribe in *Sandoval*, the Pueblo Indians of New Mexico, retained a rare communal title to their lands." *Post*, at 21, n. 4. But *Sandoval* is not only a case about the Pueblos; it is a foundational precedent recognizing that Congress can welcome Native Americans to participate in a broader political community without sacrificing their tribal sovereignty.

P. 2d 1051, 1054 (Okla. 1994); Full Faith and Credit of
Tribal Courts, Okla. State Cts. Network (Apr. 18, 2019),
https://www.oscn.net/applications/oscn/DeliverDocument.
asp?CiteID=458214.

Maybe some of these changes happened for altruistic rea-
sons, maybe some for other reasons. It seems, for example,
that at least certain Members of Congress hesitated about
disestablishment in 1906 because they feared any reversion
of the Creek lands to the public domain would trigger a stat-
utory commitment to hand over portions of these lands to
already powerful railroad interests. See, *e.g.*, 40 Cong. Rec.
2976 (1906) (Sen. McCumber); *Id.*, at 3053 (Sen. Aldrich).
Many of those who advanced the reorganization efforts of
the 1930s may have done so more out of frustration with
efforts to assimilate Native Americans than any disaffec-
tion with assimilation as the ultimate goal. See 1 Cohen
§1.05; Scherer, Imperfect Victories, at 2–4. But whatever
the confluence of reasons, in all this history there simply
arrived no moment when any Act of Congress dissolved the
Creek Tribe or disestablished its reservation. In the end,
Congress moved in the opposite direction.[7]

## D

Ultimately, Oklahoma is left to pursue a very different
sort of argument. Now, the State points to historical prac-
tices and demographics, both around the time of and long
after the enactment of all the relevant legislation. These
facts, the State submits, are enough by themselves to prove
disestablishment. Oklahoma even classifies and catego-

_____

[7] The dissent ultimately concedes what Oklahoma will not: that no
"individual congressional action or piece of evidence, standing alone, dis-
established the Creek reservation." *Post*, at 9–10. Instead we're told we
must consider "all of the relevant Acts of Congress together, viewed in
light of contemporaneous and subsequent contextual evidence." *Ibid.* So,
once again, the dissent seems to suggest that it's the arguments in the
*next* section that will get us across the line to disestablishment.

rizes how we should approach the question of disestablishment into three "steps." It reads *Solem* as requiring us to examine the laws passed by Congress at the first step, contemporary events at the second, and even later events and demographics at the third. On the State's account, we have so far finished only the first step; two more await.

This is mistaken. When interpreting Congress's work in this arena, no less than any other, our charge is usually to ascertain and follow the original meaning of the law before us. *New Prime Inc.* v. *Oliveira*, 586 U. S. ___, ___ (2019) (slip op., at 6). That is the only "step" proper for a court of law. To be sure, if during the course of our work an ambiguous statutory term or phrase emerges, we will sometimes consult contemporaneous usages, customs, and practices to the extent they shed light on the meaning of the language in question at the time of enactment. *Ibid.* But Oklahoma does not point to any ambiguous language in any of the relevant statutes that could plausibly be read as an Act of disestablishment. Nor may a court favor contemporaneous or later practices *instead of* the laws Congress passed. As *Solem* explained, "[o]nce a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." 465 U. S., at 470 (citing *United States* v. *Celestine*, 215 U. S. 278, 285 (1909)).

Still, Oklahoma reminds us that *other* language in *Solem* isn't so constrained. In particular, the State highlights a passage suggesting that "[w]here non-Indian settlers flooded into the opened portion of a reservation and the area has long since lost its Indian character, we have acknowledged that *de facto*, if not *de jure*, diminishment may have occurred." 465 U. S., at 471. While acknowledging that resort to subsequent demographics was "an unorthodox and potentially unreliable method of statutory interpretation," the Court seemed nonetheless taken by its

"obvious practical advantages." *Id.*, at 472, n. 13, 471.

Out of context, statements like these might suggest historical practices or current demographics can suffice to disestablish or diminish reservations in the way Oklahoma envisions. But, in the end, *Solem* itself found these kinds of arguments provided "no help" in resolving the dispute before it. *Id.*, at 478. Notably, too, *Solem* suggested that whatever utility historical practice or demographics might have was "demonstrated" by this Court's earlier decision in *Rosebud Sioux Tribe* v. *Kneip*, 430 U. S. 584 (1977). See *Solem*, 465 U. S., at 470, n. 10. And *Rosebud Sioux* hardly endorsed the use of such sources to find disestablishment. Instead, based on the statute at issue there, the Court came "to the firm conclusion that congressional intent" was to diminish the reservation in question. 430 U. S., at 603. At that point, the Tribe sought to cast doubt on the clear import of the text by citing subsequent historical events—and the Court rejected the Tribe's argument *exactly because* this kind of evidence could not overcome congressional intent as expressed in a statute. *Id.*, at 604–605.

This Court has already sought to clarify that extratextual considerations hardly supply the blank check Oklahoma supposes. In *Parker*, for example, we explained that "[e]vidence of the subsequent treatment of the disputed land . . . has 'limited interpretive value.'" 577 U. S., at \_\_\_ (slip op., at 11) (quoting *South Dakota* v. *Yankton Sioux Tribe*, 522 U. S. 329, 355 (1998)).[8] *Yankton Sioux* called it the "least

———————

[8] The dissent suggests *Parker* meant to say only that evidence of subsequent treatment had limited interpretative value "*in that case*." *Post,* at 12. But the dissent includes just a snippet of the relevant passage. Read in full, there is little room to doubt *Parker* invoked a general rule:

"This subsequent demographic history cannot overcome our conclusion that Congress did not intend to diminish the reservation in 1882. And it is not our rule to 'rewrite' the 1882 Act in light of this subsequent demographic history. *DeCoteau*, 420 U. S., at 447. After all, evidence of the changing demographics of disputed land is 'the least compelling' evi-

compelling" form of evidence. *Id.*, at 356. Both cases emphasized that what value such evidence has can only be *interpretative*—evidence that, at best, might be used to the extent it sheds light on what the terms found in a statute meant at the time of the law's adoption, not as an alternative means of proving disestablishment or diminishment.

To avoid further confusion, we restate the point. There is no need to consult extratextual sources when the meaning of a statute's terms is clear. Nor may extratextual sources overcome those terms. The only role such materials can properly play is to help "clear up . . . not create" ambiguity about a statute's original meaning. *Milner* v. *Department of Navy*, 562 U. S. 562, 574 (2011). And, as we have said time and again, once a reservation is established, it retains that status "until Congress explicitly indicates otherwise." *Solem*, 465 U. S., at 470 (citing *Celestine*, 215 U. S., at 285); see also *Yankton Sioux*, 522 U. S., at 343 ("[O]nly Congress can alter the terms of an Indian treaty by diminishing a reservation, and its intent to do so must be clear and plain") (citation and internal quotation marks omitted).

The dissent charges that we have failed to take account of the "compelling reasons" for considering extratextual evidence as a matter of course. *Post*, at 11–12. But Oklahoma and the dissent have cited no case in which this Court has found a reservation disestablished without first concluding that a statute required that result. Perhaps they wish this case to be the first. To follow Oklahoma and the dissent down that path, though, would only serve to allow States and courts to finish work Congress has left undone, usurp

_____

dence in our diminishment analysis, for '[e]very surplus land Act necessarily resulted in a surge of non-Indian settlement and degraded the "Indian character" of the reservation, yet we have repeatedly stated that not every surplus land Act diminished the affected reservation.' *Yankton Sioux*, 522 U. S., at 356. . . . Evidence of the subsequent treatment of the disputed land by Government officials likewise has 'limited interpretive value.' *Id.*, at 355." 577 U. S., at ___ (slip op., at 11).

the legislative function in the process, and treat Native American claims of statutory right as less valuable than others. None of that can be reconciled with our normal interpretive rules, let alone our rule that disestablishment may not be lightly inferred and treaty rights are to be construed in favor, not against, tribal rights. *Solem*, 465 U. S., at 472.[9]

To see the perils of substituting stories for statutes, we need look no further than the stories we are offered in the case before us. Put aside that the Tribe could tell more than a few stories of its own: Take just the evidence on which Oklahoma and the dissent wish to rest their case. First, they point to Oklahoma's long historical prosecutorial practice of asserting jurisdiction over Indians in state court, even for serious crimes on the contested lands. If the Creek lands really were part of a reservation, the argument goes, all of these cases should have been tried in federal court pursuant to the MCA. Yet, until the Tenth Circuit's *Murphy* decision a few years ago, no court embraced that possibility. See *Murphy*, 875 F. 3d 896. Second, they offer statements from various sources to show that "everyone" in the late 19th and early 20th century thought the reservation system—and the Creek Nation—would be disbanded soon. Third, they stress that non-Indians swiftly moved on to the reservation in the early part of the last century, that Tribe

——————

[9] In an effort to support its very different course, the dissent stitches together quotes from *Rosebud Sioux Tribe* v. *Knelp*, 430 U. S. 584 (1977), and *South Dakota* v. *Yankton Sioux Tribe*, 522 U. S. 329 (1998). *Post,* at 10–11. But far from supporting the dissent, both cases emphasize that "[t]he focus of our inquiry is congressional intent," *Rosebud*, 430 U. S., at 588, n. 4; see also *Yankton Sioux*, 522 U. S., at 343, and merely acknowledge that extratextual sources may help resolve ambiguity about Congress's directions. The dissent's appeal to *Solem* fares no better. As we have seen, the extratextual sources in S*olem* only confirmed what the relevant statute already suggested—that the reservation in question was not diminished or disestablished. 465 U. S., at 475–476.

members today constitute a small fraction of those now re-
siding on the land, and that the area now includes a "vi-
brant city with expanding aerospace, healthcare, technol-
ogy, manufacturing, and transportation sectors." Brief for
Petitioner in *Carpenter* v. *Murphy*, O. T. 2018, No. 17–1107,
p. 15. All this history, we are told, supplies "compelling"
evidence about the lands in question.

Maybe so, but even taken on its own terms none of this
evidence tells the story we are promised. Start with the
State's argument about its longstanding practice of assert-
ing jurisdiction over Native Americans. Oklahoma pro-
ceeds on the implicit premise that its historical practices
are unlikely to have defied the mandates of the federal
MCA. That premise, though, appears more than a little
shaky. In conjunction with the MCA, §1151(a) not only
sends to federal court certain major crimes committed by
Indians on reservations. Two doors down, in §1151(c), the
statute does the same for major crimes committed by Indi-
ans on "Indian allotments, the Indian titles of which have
not been extinguished." Despite this direction, however,
Oklahoma state courts erroneously entertained prosecu-
tions for major crimes by Indians on Indian allotments for
*decades*, until state courts finally disavowed the practice in
1989. See *State* v. *Klindt*, 782 P. 2d 401, 404 (Okla. Crim.
App. 1989) (overruling *Ex parte Nowabbi*, 60 Okla. Crim.
III, 61 P. 2d 1139 (1936)); see also *United States* v. *Sands*,
968 F. 2d 1058, 1062–1063 (CA10 1992). And if the State's
prosecution practices disregarded §1151(c) for so long, it's
unclear why we should take those same practices as a reli-
able guide to the meaning and application of §1151(a).

Things only get worse from there. Why did Oklahoma
historically think it could try Native Americans for any
crime committed on restricted allotments or anywhere else?
Part of the explanation, Oklahoma tells us, is that it
thought the eastern half of the State was always categori-
cally exempt from the terms of the federal MCA. So

whether a crime was committed on a restricted allotment, a reservation, or land that wasn't Indian country at all, to Oklahoma it just didn't matter. In the State's view, when Congress adopted the Oklahoma Enabling Act that paved the way for its admission to the Union, it carved out a special exception to the MCA for the eastern half of the State where the Creek lands can be found. By Oklahoma's own admission, then, for decades its historical practices in the area in question didn't even *try* to conform to the MCA, all of which makes the State's past prosecutions a meaningless guide for determining what counted as Indian country. As it turns out, too, Oklahoma's claim to a special exemption was itself mistaken, yet one more error in historical practice that even the dissent does not attempt to defend. See Part V, *infra*.[10]

To be fair, Oklahoma is far from the only State that has overstepped its authority in Indian country. Perhaps often in good faith, perhaps sometimes not, others made similar mistakes in the past. But all that only underscores further the danger of relying on state practices to determine the meaning of the federal MCA. See, *e.g.*, *Negonsett*, 507 U. S., at 106–107 ("[I]n practice, Kansas had exercised jurisdiction over all offenses committed on Indian reservations involving Indians" (quoting memorandum from Secretary of the Interior, H. R. Rep. No. 1999, 76th Cong., 3d Sess., 4 (1940)); Scherer, Imperfect Victories, at 18 (describing "nationwide jurisdictional confusion" as a result of the MCA);

_____

[10] The dissent tries to avoid this inconvenient history by distinguishing fee allotments from reservations, noting that the two categories are legally distinct and geographically incommensurate. *Post,* at 27. But this misses the point: The *reason* that Oklahoma thought it could prosecute Indians for crimes on restricted allotments applied with equal force to reservations. And it hardly "stretches the imagination" to think that reason was wrong, *post*, at 28, when the dissent itself does not dispute our rejection of it in Part V.

Cohen §6.04(4)(a) ("Before 1942 the state of New York regularly exercised or claimed the right to exercise jurisdiction over the New York reservations, but a federal court decision in that year raised questions about the validity of state jurisdiction"); Brief for United States as *Amicus Curiae* in *Carpenter* v. *Murphy*, O. T. 2018, No. 17–1107, pp. 7a–8a (Letter from Secretary of the Interior, Mar. 27, 1963) (noting that many States have asserted criminal jurisdiction over Indians without an apparent basis in a federal law).[11]

Oklahoma next points to various statements during the allotment era which, it says, show that even the Creek understood their reservation was under threat. And there's no doubt about that. By 1893, the leadership of the Creek Nation saw what the federal government had in mind: "They [the federal government] do not deny any of our rights under treaty, but say they will go to the people themselves and confer with them and urge upon them the necessity of a change in their present condition, and upon their refusal will force a change upon them." P. Porter & A. McKellop, Printed Statement of Creek Delegates, reprinted in Creek Delegation Documents 8–9 (Feb. 9, 1893). Not a decade later, and as a result of these forced changes, the leadership recognized that "'[i]t would be difficult, if not impossible to successfully operate the Creek government now.'" App. to Brief for Respondent 8a (Message to Creek

---

[11] Unable to answer Oklahoma's admitted error about the very federal criminal statute before us, the dissent travels far afield, pointing to the fact an Oklahoma court heard a civil case in 1915 about an inheritance—involving members of a different Tribe—as "evidence" Congress disestablished the Creek Reservation. See *post,* at 21 (citing *Palmer* v. *Cully,* 52 Okla. 454, 455–465, 153 P. 154, 155–157 (1915) (*per curiam*)). But even assuming that Oklahoma courts exercised civil jurisdiction over Creek members, too, the dissent never explains why this jurisdiction implies the Creek Reservation must have been disestablished. After all, everyone agrees that the Creeks were prohibited from having their own courts at the time. So it should be no surprise that some Creek might have resorted to state courts in hope of resolving their disputes.

National Council (May 7, 1901), reprinted in The Indian Journal (May 10, 1901)). Surely, too, the future looked even bleaker: "'The remnant of a government now accorded to us can be expected to be maintained only until all settlements of our landed and other interests growing out of treaty stipulations with the government of the United States shall have been settled.'" *Ibid.*

But note the nature of these statements. The Creek Nation recognized that the federal government *will* seek to get popular support or otherwise *would* force change. Likewise, the Tribe's government *would* continue for only so long. These were prophesies, and hardly groundbreaking ones at that. After all, the 1901 Creek Allotment Agreement explicitly said that the tribal government "shall not continue" past 1906. §46, 31 Stat. 872. So what might statements like these tell us that isn't already evident from the statutes themselves? Oklahoma doesn't suggest they shed light on the meaning of some disputed and ambiguous statutory direction. More nearly, the State seeks to render the Creek's fears self-fulfilling.[12]

We are also asked to consider commentary from those outside the Tribe. In particular, the dissent reports that the federal government "operated" on the "understanding" that the reservation was disestablished. *Post,* at 32. In support of its claim, the dissent highlights a 1941 statement from Felix Cohen. Then serving as an official at the Interior Department, Cohen opined that "'all offenses by or against Indians' in the former Indian Territory 'are subject to State

——————

[12] The dissent finds the statements of the Creek leadership so probative that it cites them not just as evidence about the meaning of treaties the Tribe signed but even as evidence about the meaning of general purpose laws the Creek had no hand in. See *post,* at 26 (citing Chief Porter's views on the legal effects of the Oklahoma Enabling Act). That is quite a stretch from using tribal statements as "historical evidence of 'the manner in which [treaties were] negotiated' with the . . . Tribe." *Parker*, 577 U. S., at \_\_\_ (slip op., at 9) (quoting *Solem* v. *Bartlett*, 465 U. S. 463, 471 (1984)).

laws.' " *Ibid.* (quoting App. to Supp. Reply Brief for Peti-
tioner in *Carpenter* v. *Murphy*, O. T. 2018, No. 17–1107, p.
1a (Memorandum for Commissioner of Indian Affairs (July
11, 1941)).  But that statement is incorrect.  As we have just
seen, Oklahoma's courts acknowledge that the State lacks
jurisdiction over Indian crimes on Indian allotments.  See
*Klindt*, 782 P. 2d, at 403–404.  And the dissent does not dis-
pute that Oklahoma is without authority under the MCA to
try Indians for crimes committed on restricted allotments
and any reservation.  All of which highlights the pitfalls of
elevating commentary over the law.[13]

Finally, Oklahoma points to the speedy and persistent
movement of white settlers onto Creek lands throughout
the late 19th and early 20th centuries.  But this history
proves no more helpful in discerning statutory meaning.
Maybe, as Oklahoma supposes, it suggests that some white
settlers in good faith thought the Creek lands no longer con-
stituted a reservation.  But maybe, too, some didn't care and

---

[13] Part of the reason for Cohen's error might be explained by a portion
of the memorandum the dissent leaves unquoted.  Cohen concluded that
Oklahoma was free to try Indians anywhere in the State because, among
other things, the Oklahoma Enabling Act "transfer[red] . . . jurisdiction
from the Federal courts to the State courts upon the establishment of the
State of Oklahoma."  App. to Supp. Reply Brief for Petitioner in *Carpen-
ter* v. *Murphy*, O. T. 2018, No. 17–1107, p. 1a (Memorandum for Commis-
sioner of Indian Affairs (July 11, 1941)).  Yet, as we explore below, the
Oklahoma Enabling Act did *not* send cases covered by the federal MCA
to state court.  See Part V, *infra*.  Other, contemporaneous Interior De-
partment memoranda acknowledged that Oklahoma state courts had
simply "assumed jurisdiction" over cases arising on restricted allotments
without any clear authority in the Oklahoma Enabling Act or the MCA,
and much the same appears to have occurred here.  App. to Supp. Reply
Brief for Respondent in *Carpenter* v. *Murphy*, O. T. 2018, No. 17–1107,
p. 1a (Memorandum from N. Gray, Dept. of Interior, for Mr. Flanery
(Aug. 12, 1942)).  So rather than Oklahoma and the United States having
a "shared understanding" that Congress had disestablished the Creek
Reservation, *post*, at 27, it seems more accurate to say that for many
years much uncertainty remained about whether the MCA applied in
eastern Oklahoma.

others never paused to think about the question. Certain historians have argued, for example, that the loss of Creek land ownership was accelerated by the discovery of oil in the region during the period at issue here. A number of the federal officials charged with implementing the laws of Congress were apparently openly conflicted, holding shares or board positions in the very oil companies who sought to deprive Indians of their lands. A. Debo, And Still the Waters Run 86–87, 117–118 (1940). And for a time Oklahoma's courts appear to have entertained sham competency and guardianship proceedings that divested Tribe members of oil rich allotments. *Id.*, at 104–106, 233–234; Brief for Historians et al. as *Amici Curiae* 26–30. Whatever else might be said about the history and demographics placed before us, they hardly tell a story of unalloyed respect for tribal interests.[14]

In the end, only one message rings true. Even the carefully selected history Oklahoma and the dissent recite is not nearly as tidy as they suggest. It supplies us with little help

––––––––––

[14] The dissent asks us to examine a hodge-podge of other, but no more compelling, material. For example, the dissent points to later statutes that do no more than confirm there are former reservations in the State of Oklahoma. *Post*, at 30–31. It cites legislative history to show that Congress had the Creek Nation—or, at least, its neighbors—in mind when it added these in 1988. *Post,* at 31, n. 7. The dissent cites a Senate Report from 1989 and post-1980 statements made by representatives of other tribes. *Post*, at 30, 32–33. It highlights three occasions on which this Court referred to something like a "former Creek Nation," though it neglects to add that in each the Court was referring to the loss of the Nation's communal fee title, not its sovereignty. *Grayson* v. *Harris*, 267 U. S. 352, 357 (1925); *Woodward* v. *DeGraffenreid*, 238 U. S. 284, 289–290 (1915); *Washington* v. *Miller*, 235 U. S. 422, 423–425 (1914). The dissent points as well to a single instance in which the Creek Nation disclaimed reservation boundaries for purposes of litigation in a lower court, *post,* at 32, but ignores that the Creek Nation has repeatedly filed briefs in this Court to the contrary. This is thin gruel to set against treaty promises enshrined in statutes.

in discerning the law's meaning and much potential for mischief.  If anything, the persistent if unspoken message here seems to be that we should be taken by the "practical advantages" of ignoring the written law.  How much easier it would be, after all, to let the State proceed as it has always assumed it might.  But just imagine what it would mean to indulge that path.  A State exercises jurisdiction over Native Americans with such persistence that the practice seems normal.  Indian landowners lose their titles by fraud or otherwise in sufficient volume that no one remembers whose land it once was.  All this continues for long enough that a reservation that was once beyond doubt becomes questionable, and then even farfetched.  Sprinkle in a few predictions here, some contestable commentary there, and the job is done, a reservation is disestablished.  None of these moves would be permitted in any other area of statutory interpretation, and there is no reason why they should be permitted here.  That would be the rule of the strong, not the rule of law.

IV

Unable to show that Congress disestablished the Creek Reservation, Oklahoma next tries to turn the tables in a completely different way.  Now, it contends, Congress never established a reservation in the first place.  Over all the years, from the federal government's first guarantees of land and self-government in 1832 and through the litany of promises that followed, the Tribe never received a reservation.  Instead, what the Tribe has had all this time qualifies only as a "dependent Indian community."

Even if we were to accept Oklahoma's bold feat of reclassification, however, it's hardly clear the State would win this case.  "Reservation[s]" and "Indian allotments, the Indian titles to which have not been extinguished," qualify as Indian country under subsections (a) and (c) of §1151.  But "dependent Indian communities" *also* qualify as Indian

country under subsection (b). So Oklahoma lacks jurisdiction to prosecute Mr. McGirt whether the Creek lands happen to fall in one category or another.

About this, Oklahoma is at least candid. It admits the entire point of its reclassification exercise is to avoid *Solem*'s rule that only Congress may disestablish a reservation. And to achieve that, the State has to persuade us not only that the Creek lands constitute a "dependent Indian community" rather than a reservation. It *also* has to convince us that we should announce a rule that dependent Indian community status can be lost more easily than reservation status, maybe even by the happenstance of shifting demographics.

To answer this argument, it's enough to address its first essential premise. Holding that the Creek never had a reservation would require us to stand willfully blind before a host of federal statutes. Perhaps that is why the Solicitor General, who supports Oklahoma's disestablishment argument, refuses to endorse this alternative effort. It also may be why Oklahoma introduced this argument for affirmance only for the first time in this Court. And it may be why the dissent makes no attempt to defend Oklahoma here. What are we to make of the federal government's repeated treaty promises that the land would be "solemnly guarantied to the Creek Indians," that it would be a "permanent home," "forever set apart," in which the Creek would be "secured in the unrestricted right of self-government"? What about Congress's repeated references to a "Creek reservation" in its statutes? No one doubts that this kind of language normally suffices to establish a federal reservation. So what could possibly make this case different?

Oklahoma's answer only gets more surprising. *The* reason that the Creek's lands are not a reservation, we're told, is that the Creek Nation originally held fee title. Recall that the Indian Removal Act authorized the President not only to "solemnly . . . assure the tribe . . . that the United States

will forever secure and guaranty to them . . . the country so exchanged with them," but also, "if they prefer it, . . . the United States will cause a patent or grant to be made and executed to them for the same." 4 Stat. 412. Recall that the Creek insisted on this additional protection when negotiating the Treaty of 1833, and in fact received a land patent pursuant to that treaty some 19 years later. In the eyes of Oklahoma, the Tribe's choice on this score was a fateful one. By asking for (and receiving) fee title to their lands, the Creek inadvertently made their tribal sovereignty easier to divest rather than harder.

The core of Oklahoma's argument is that a reservation must be land "reserved from sale." *Celestine*, 215 U. S., at 285. Often, that condition is satisfied when the federal government promises to hold aside a particular piece of federally owned land in trust for the benefit of the Tribe. And, admittedly, the Creek's arrangement was different, because the Tribe held "fee simple title, not the usual Indian right of occupancy." *United States* v. *Creek Nation*, 295 U. S. 103, 109 (1935). Still, as we explained in Part II, the land *was* reserved from sale in the very real sense that the government could not "give the tribal lands to others, or to appropriate them to its own purposes," without engaging in "'an act of confiscation.'" *Id.*, at 110.

It's hard to see, too, how any difference between these two arrangements might work to the detriment of the Tribe. Just as we have never insisted on any particular form of words when it comes to disestablishing a reservation, we have never done so when it comes to establishing one. See *Minnesota* v. *Hitchcock*, 185 U. S. 373, 390 (1902) ("[I]n order to create a reservation it is not necessary that there should be a formal cession or a formal act setting apart a particular tract. It is enough that from what has been there results a certain defined tract appropriated to certain purposes"). As long as 120 years ago, the federal court for the Indian Territory recognized all this and rightly rejected the

notion that fee title is somehow inherently incompatible with reservation status. *Maxey* v. *Wright*, 54 S. W. 807, 810 (Indian Terr. 1900).

By now, Oklahoma's next move will seem familiar. Seeking to sow doubt around express treaty promises, it cites some stray language from a statute that does not control here, a piece of congressional testimony there, and the scattered opinions of agency officials everywhere in between. See, *e.g.*, Act of July 31, 1882, ch. 360, 22 Stat. 179 (referring to Creek land as "Indian country" as opposed to an "Indian reservation"); S. Doc. No. 143, 59th Cong., 1st. Sess., 33 (1906) (Chief of Choctaw Nation—which had an arrangement similar to the Creek's—testified that both Tribes "object to being classified with the reservation Indians"); Dept. of Interior, Census Office, Report on Indians Taxed and Indians Not Taxed in the U. S. 284 (1894) (Creeks and neighboring Tribes were "not on the ordinary Indian reservation, but on lands patented to them by the United States"). Oklahoma stresses that this Court even once called the Creek lands a "dependent Indian community," though it used that phrase in passing and only to show that the Tribe's "property and affairs were subject to the control and management of that government"—a point that would also be true if the lands were a reservation. *Creek Nation*, 295 U. S., at 109. Unsurprisingly given the Creek Nation's nearly 200-year occupancy of these lands, both sides have turned up a few clues suggesting the label "reservation" either did or did not apply. One thing everyone can agree on is this history is long and messy.

But the most authoritative evidence of the Creek's relationship to the land lies not in these scattered references; it lies in the treaties and statutes that promised the land to the Tribe in the first place. And, if not for the Tribe's fee title to its land, no one would question that these treaties and statutes created a reservation. So the State's argument inescapably boils down to the untenable suggestion that,

when the federal government agreed to offer more protection for tribal lands, it really provided less. All this time, fee title was nothing more than another trap for the wary.

## V

That leaves Oklahoma to attempt yet another argument in the alternative. We alluded to it earlier in Part III. Now, the State accepts for argument's sake that the Creek land is a reservation and thus "Indian country" for purposes of the Major Crimes Act. It accepts, too, that this would normally mean serious crimes by Indians on the Creek Reservation would have to be tried in federal court. But, the State tells us, none of that matters; everything the parties have briefed and argued so far is beside the point. It's all irrelevant because it turns out the MCA just doesn't apply to the eastern half of Oklahoma, and it never has. That federal law may apply to other States, even to the western half of Oklahoma itself. But eastern Oklahoma is and has always been exempt. So whether or not the Creek have a reservation, the State's historic practices have always been correct and it remains free to try individuals like Mr. McGirt in its own courts.

Notably, the dissent again declines to join Oklahoma in its latest twist. And, it turns out, for good reason. In support of its argument, Oklahoma points to statutory artifacts from its territorial history. The State of Oklahoma was formed from two territories: the Oklahoma Territory in the west and Indian Territory in the east. Originally, it seems criminal prosecutions in the Indian Territory were split between tribal and federal courts. See Act of May 2, 1890, §30, 26 Stat. 94. But, in 1897, Congress abolished that scheme, granting the U. S. Courts of the Indian Territory "exclusive jurisdiction" to try "all criminal causes for the punishment of any offense." Act of June 7, 1897, 30 Stat. 83. These federal territorial courts applied federal law and

state law borrowed from Arkansas "to all persons . . . irrespective of race." *Ibid.* A year later, Congress abolished tribal courts and transferred all pending criminal cases to U. S. courts of the Indian Territory. Curtis Act of 1898, §28, 30 Stat. 504–505. And, Oklahoma says, sending Indians to federal court and all others to state court would be inconsistent with this established and enlightened policy of applying the same law in the same courts to everyone.

Here again, however, arguments along these and similar lines have been "frequently raised" but rarely "accepted." *United States* v. *Sands*, 968 F. 2d 1058, 1061 (CA10 1992) (Kelly, J.). "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in this Nation's history." *Rice* v. *Olson*, 324 U. S. 786, 789 (1945). Chief Justice Marshall, for example, held that Indian Tribes were "distinct political communities, having territorial boundaries, within which their authority is exclusive . . . which is not only acknowledged, but guarantied by the United States," a power dependent on and subject to no state authority. *Worcester* v. *Georgia*, 6 Pet. 515, 557 (1832); see also *McClanahan* v. *Arizona Tax Comm'n*, 411 U. S. 164, 168–169 (1973). And in many treaties, like those now before us, the federal government promised Indian Tribes the right to continue to govern themselves. For all these reasons, this Court has long "require[d] a clear expression of the intention of Congress" before the state or federal government may try Indians for conduct on their lands. *Ex parte Crow Dog*, 109 U. S. 556, 572 (1883).

Oklahoma cannot come close to satisfying this standard. In fact, the only law that speaks expressly here speaks *against* the State. When Oklahoma won statehood in 1907, the MCA applied immediately according to its plain terms. That statute, as phrased at the time, provided exclusive federal jurisdiction over qualifying crimes by Indians in "*any Indian reservation*" located within "the boundaries of *any*

*State*." Act of Mar. 3, 1885, ch. 341, §9, 23 Stat. 385 (emphasis added); see also 18 U. S. C. §1151 (defining "Indian country" even more broadly). By contrast, every one of the statutes the State directs us to merely discusses the assignment of cases among courts in the *Indian Territory*. They say nothing about the division of responsibilities between federal and state authorities after Oklahoma entered the Union. And however enlightened the State may think it was for territorial law to apply to all persons irrespective of race, some Tribe members may see things differently, given that the same policy entailed the forcible closure of tribal courts in defiance of treaty terms.

Left to hunt for some statute that might have rendered the MCA inapplicable in Oklahoma after statehood, the best the State can find is the Oklahoma Enabling Act. Congress adopted that law in preparation for Oklahoma's admission in 1907. Among its many provisions sorting out the details associated with Oklahoma's transition to statehood, the Enabling Act transferred all nonfederal cases pending in territorial courts to Oklahoma's new state courts. Act of June 16, 1906, §20, 34 Stat. 277; see also Act of Mar. 4, 1907, §3, 34 Stat. 1287 (clarifying treatment of cases to which United States was a party). The State says this transfer made its courts the inheritors of the federal territorial courts' sweeping authority to try Indians for crimes committed on reservations.

But, at best, this tells only half the story. The Enabling Act not only sent all nonfederal cases pending in territorial courts to state court. It *also* transferred pending cases that arose "under the Constitution, laws, or treaties of the United States" to federal district courts. §16, 34 Stat. 277. Pending criminal cases were thus transferred to federal court if the prosecution would have belonged there had the Territory been a State at the time of the crime. §1, 34 Stat. 1287 (amending the Enabling Act). Nor did the statute make any distinction between cases arising in the former

eastern (Indian) and western (Oklahoma) territories. So, simply put, the Enabling Act sent state-law cases to state court and federal-law cases to federal court. And serious crimes by Indians in Indian country were matters that arose under the federal MCA and thus properly belonged in federal court from day one, wherever they arose within the new State.

Maybe that's right, Oklahoma acknowledges, but that's not what happened. Instead, for many years the State continued to try Indians for crimes committed anywhere within its borders. But what can that tell us? The State identifies not a single ambiguous statutory term in the MCA that its actions might illuminate. And, as we have seen, its own courts have acknowledged that the State's historic practices deviated in meaningful ways from the MCA's terms. See *supra,* at 22–23. So, once more, it seems Oklahoma asks us to defer to its usual practices *instead of* federal law, something we will not and may never do.

That takes Oklahoma down to its last straw when it comes to the MCA. If Oklahoma lacks the jurisdiction to try Native Americans it has historically claimed, that means at the time of its entry into the Union *no one* had the power to try minor Indian-on-Indian crimes committed in Indian country. This much follows, Oklahoma reminds us, because the MCA provides federal jurisdiction only for major crimes, and no tribal forum existed to try lesser cases after Congress abolished the tribal courts in 1898. Curtis Act, §28, 30 Stat. 504–505. Whatever one thinks about the plausibility of other discontinuities between federal law and state practice, the State says, it is unthinkable that Congress would have allowed such a significant "jurisdictional gap" to open at the moment Oklahoma achieved statehood.

But what the State considers unthinkable turns out to be easily imagined. Jurisdictional gaps are hardly foreign to this area of the law. See, *e.g.*, *Duro* v. *Reina,* 495 U. S. 676,

704–706 (1990) (Brennan, J., dissenting). Many tribal courts across the country were absent or ineffective during the early part of the last century, yielding just the sort of gaps Oklahoma would have us believe impossible. Indeed, this might be why so many States joined Oklahoma in prosecuting Indians without proper jurisdiction. The judicial mind abhors a vacuum, and the temptation for state prosecutors to step into the void was surely strong. See *supra*, at 23–24.

With time, too, Congress has filled many of the gaps Oklahoma worries about. One way Congress has done so is by reauthorizing tribal courts to hear minor crimes in Indian country. Congress chose exactly this course for the Creeks and others in 1936. Act of June 26, 1936, §3, 49 Stat. 1967; see also *Hodel*, 851 F. 2d, at 1442–1446. Another option Congress has employed is to allow affected Indian tribes to consent to state criminal jurisdiction. 25 U. S. C. §§1321(a), 1326. Finally, Congress has sometimes expressly expanded state criminal jurisdiction in targeted bills addressing specific States. See, *e.g.*, 18 U. S. C. §3243 (creating jurisdiction for Kansas); Act of May 31, 1946, ch. 279, 60 Stat. 229 (same for a reservation in North Dakota); Act of June 30, 1948, ch. 759, 62 Stat. 1161 (same for certain reservations in Iowa); 18 U. S. C. §1162 (creating jurisdiction for six additional States). But Oklahoma doesn't claim to have complied with the requirements to assume jurisdiction voluntarily over Creek lands. Nor has Congress ever passed a law conferring jurisdiction on Oklahoma. As a result, the MCA applies to Oklahoma according to its usual terms: Only the federal government, not the State, may prosecute Indians for major crimes committed in Indian country.

## VI

In the end, Oklahoma abandons any pretense of law and speaks openly about the potentially "transform[ative]" effects of a loss today. Brief for Respondent 43. Here, at

least, the State is finally rejoined by the dissent. If we dared to recognize that the Creek Reservation was never disestablished, Oklahoma and dissent warn, our holding might be used by other tribes to vindicate similar treaty promises. Ultimately, Oklahoma fears that perhaps as much as half its land and roughly 1.8 million of its residents could wind up within Indian country.

It's hard to know what to make of this self-defeating argument. Each tribe's treaties must be considered on their own terms, and the only question before us concerns the Creek. Of course, the Creek Reservation alone is hardly insignificant, taking in most of Tulsa and certain neighboring communities in Northeastern Oklahoma. But neither is it unheard of for significant non-Indian populations to live successfully in or near reservations today. See, *e.g.*, Brief for National Congress of American Indians Fund as *Amicus Curiae* 26–28 (describing success of Tacoma, Washington, and Mount Pleasant, Michigan); see also *Parker*, 577 U. S., at \_\_\_–\_\_\_ (slip op., at 10–12) (holding Pender, Nebraska, to be within Indian country despite tribe's absence from the disputed territory for more than 120 years). Oklahoma replies that its situation is different because the affected population here is large and many of its residents will be surprised to find out they have been living in Indian country this whole time. But we imagine some members of the 1832 Creek Tribe would be just as surprised to find them there.

What are the consequences the State and dissent worry might follow from an adverse ruling anyway? Primarily, they argue that recognizing the continued existence of the Creek Reservation could unsettle an untold number of convictions and frustrate the State's ability to prosecute crimes in the future. But the MCA applies only to certain crimes committed in Indian country by Indian defendants. A neighboring statute provides that federal law applies to a broader range of crimes by or against Indians in Indian country. See 18 U. S. C. §1152. States are otherwise free

to apply their criminal laws in cases of non-Indian victims and defendants, including within Indian country. See *McBratney*, 104 U. S., at 624. And Oklahoma tells us that somewhere between 10% and 15% of its citizens identify as Native American. Given all this, even Oklahoma admits that the vast majority of its prosecutions will be unaffected whatever we decide today.

Still, Oklahoma and the dissent fear, "[t]housands" of Native Americans like Mr. McGirt "wait in the wings" to challenge the jurisdictional basis of their state-court convictions. Brief for Respondent 3. But this number is admittedly speculative, because many defendants may choose to finish their state sentences rather than risk reprosecution in federal court where sentences can be graver. Other defendants who do try to challenge their state convictions may face significant procedural obstacles, thanks to well-known state and federal limitations on post-conviction review in criminal proceedings.[15]

In any event, the magnitude of a legal wrong is no reason to perpetuate it. When Congress adopted the MCA, it broke many treaty promises that had once allowed tribes like the Creek to try their own members. But, in return, Congress allowed only the federal government, not the States, to try

_____

[15] For example, Oklahoma appears to apply a general rule that "issues that were not raised previously on direct appeal, but which could have been raised, are waived for further review." *Logan* v. *State*, 2013 OK CR 2, ¶ 1, 293 P. 3d 969, 973. Indeed, JUSTICE THOMAS contends that this state-law limitation on collateral review prevents us from considering even the case now before us. *Post,* at 2 (dissenting opinion). But while that state-law rule may often bar our way, it doesn't in this case. After noting a potential state-law obstacle, the Oklahoma Court of Criminal Appeals (OCCA) proceeded to address the merits of Mr. McGirt's federal MCA claim anyway. Because the OCCA's opinion "fairly appears to rest primarily on federal law or to be interwoven with federal law" and lacks any "plain statement" that it was relying on a state-law ground, we have jurisdiction to consider the federal-law question presented to us. See *Michigan* v. *Long*, 463 U. S. 1032, 1040–1041, 1044 (1983).

tribal members for major crimes. All our decision today does is vindicate that replacement promise. And if the threat of unsettling convictions cannot save a precedent of this Court, see *Ramos* v. *Louisiana*, 590 U. S. ___, ___–___ (2020) (plurality opinion) (slip op., at 23–26), it certainly cannot force us to ignore a statutory promise when no precedent stands before us at all.

What's more, a decision for *either* party today risks upsetting some convictions. Accepting the State's argument that the MCA never applied in Oklahoma would preserve the state-court convictions of people like Mr. McGirt, but simultaneously call into question every *federal* conviction obtained for crimes committed on trust lands and restricted Indian allotments since Oklahoma recognized its jurisdictional error more than 30 years ago. See *supra*, at 22. It's a consequence of their own arguments that Oklahoma and the dissent choose to ignore, but one which cannot help but illustrate the difficulty of trying to guess how a ruling one way or the other might affect past cases rather than simply proceeding to apply the law as written.

Looking to the future, Oklahoma warns of the burdens federal and tribal courts will experience with a wider jurisdiction and increased caseload. But, again, for every jurisdictional reaction there seems to be an opposite reaction: recognizing that cases like Mr. McGirt's belong in federal court simultaneously takes them out of state court. So while the federal prosecutors might be initially understaffed and Oklahoma prosecutors initially overstaffed, it doesn't take a lot of imagination to see how things could work out in the end.

Finally, the State worries that our decision will have significant consequences for civil and regulatory law. The only question before us, however, concerns the statutory definition of "Indian country" as it applies in federal criminal law under the MCA, and often nothing requires other civil stat-

utes or regulations to rely on definitions found in the criminal law. Of course, many federal civil laws and regulations do currently borrow from §1151 when defining the scope of Indian country. But it is far from obvious why this collateral drafting choice should be allowed to skew our interpretation of the MCA, or deny its promised benefits of a federal criminal forum to tribal members.

It isn't even clear what the real upshot of this borrowing into civil law may be. Oklahoma reports that recognizing the existence of the Creek Reservation for purposes of the MCA might potentially trigger a variety of federal civil statutes and rules, including ones making the region eligible for assistance with homeland security, 6 U. S. C. §§601, 606, historical preservation, 54 U. S. C. §302704, schools, 20 U. S. C. §1443, highways, 23 U. S. C. §120, roads, §202, primary care clinics, 25 U. S. C. §1616e–1, housing assistance, §4131, nutritional programs, 7 U. S. C. §§2012, 2013, disability programs, 20 U. S. C. §1411, and more. But what are we to make of this? Some may find developments like these unwelcome, but from what we are told others may celebrate them.

The dissent isn't so sanguine—it assures us, without further elaboration, that the consequences will be "drastic precisely because they depart from . . . more than a century [of] settled understanding." *Post,* at 37. The prediction is a familiar one. Thirty years ago the Solicitor General warned that "[l]aw enforcement would be rendered very difficult" and there would be "grave uncertainty regarding the application" of state law if courts departed from decades of "long-held understanding" and recognized that the federal MCA applies to restricted allotments in Oklahoma. Brief for United States as *Amicus Curiae* in *Oklahoma* v. *Brooks*, O.T. 1988, No. 88–1147, pp. 2, 9, 18, 19. Yet, during the intervening decades none of these predictions panned out, and that fact stands as a note of caution against too readily crediting identical warnings today.

More importantly, dire warnings are just that, and not a license for us to disregard the law. By suggesting that our interpretation of Acts of Congress adopted a century ago should be inflected based on the costs of enforcing them today, the dissent tips its hand. Yet again, the point of looking at subsequent developments seems not to be determining the meaning of the laws Congress wrote in 1901 or 1906, but emphasizing the costs of taking them at their word.

Still, we do not disregard the dissent's concern for reliance interests. It only seems to us that the concern is misplaced. Many other legal doctrines—procedural bars, res judicata, statutes of repose, and laches, to name a few—are designed to protect those who have reasonably labored under a mistaken understanding of the law. And it is precisely because those doctrines exist that we are "fre[e] to say what we know to be true . . . today, while leaving questions about . . . reliance interest[s] for later proceedings crafted to account for them." *Ramos*, 590 U. S., at ___ (plurality opinion) (slip op., at 24).

In reaching our conclusion about what the law demands of us today, we do not pretend to foretell the future and we proceed well aware of the potential for cost and conflict around jurisdictional boundaries, especially ones that have gone unappreciated for so long. But it is unclear why pessimism should rule the day. With the passage of time, Oklahoma and its Tribes have proven they can work successfully together as partners. Already, the State has negotiated hundreds of intergovernmental agreements with tribes, including many with the Creek. See Okla. Stat., Tit. 74, §1221 (2019 Cum. Supp.); Oklahoma Secretary of State, Tribal Compacts and Agreements, www.sos.ok.gov/tribal.aspx. These agreements relate to taxation, law enforcement, vehicle registration, hunting and fishing, and countless other fine regulatory questions. See Brief for Tom Cole et al. as *Amici Curiae* 13–19. No one before us claims that the spirit of good faith, "comity and

cooperative sovereignty" behind these agreements, *id.*, at 20, will be imperiled by an adverse decision for the State today any more than it might be by a favorable one.[16] And, of course, should agreement prove elusive, Congress remains free to supplement its statutory directions about the lands in question at any time. It has no shortage of tools at its disposal.

\*

The federal government promised the Creek a reservation in perpetuity. Over time, Congress has diminished that reservation. It has sometimes restricted and other times expanded the Tribe's authority. But Congress has never withdrawn the promised reservation. As a result, many of the arguments before us today follow a sadly familiar pattern. Yes, promises were made, but the price of keeping them has become too great, so now we should just cast a blind eye. We reject that thinking. If Congress wishes to withdraw its promises, it must say so. Unlawful acts, performed long enough and with sufficient vigor, are never enough to amend the law. To hold otherwise would be to elevate the most brazen and longstanding injustices over the law, both rewarding wrong and failing those in the right.

The judgment of the Court of Criminal Appeals of Oklahoma is

*Reversed.*

---

[16] This sense of cooperation and a shared future is on display in this very case. The Creek Nation is supported by an array of leaders of other Tribes and the State of Oklahoma, many of whom had a role in negotiating exactly these agreements. See Brief for Tom Cole et al. as *Amici Curiae* 1 ("Amici are a former Governor, State Attorney General, cabinet members, and legislators of the State of Oklahoma, and two federally recognized Indian tribes, the Chickasaw Nation and Choctaw Nation of Oklahoma") (brief authored by Robert H. Henry, also a former State Attorney General and Chief Judge of the Tenth Circuit).

# SUPREME COURT OF THE UNITED STATES

———————

No. 18–9526

———————

## JIMCY McGIRT, PETITIONER *v.* OKLAHOMA

ON WRIT OF CERTIORARI TO THE COURT OF CRIMINAL
APPEALS OF OKLAHOMA

[July 9, 2020]

CHIEF JUSTICE ROBERTS, with whom JUSTICE ALITO and JUSTICE KAVANAUGH join, and with whom JUSTICE THOMAS joins except as to footnote 9, dissenting.

In 1997, the State of Oklahoma convicted petitioner Jimcy McGirt of molesting, raping, and forcibly sodomizing a four-year-old girl, his wife's granddaughter. McGirt was sentenced to 1,000 years plus life in prison. Today, the Court holds that Oklahoma lacked jurisdiction to prosecute McGirt—on the improbable ground that, unbeknownst to anyone for the past century, a huge swathe of Oklahoma is actually a Creek Indian reservation, on which the State may not prosecute serious crimes committed by Indians like McGirt. Not only does the Court discover a Creek reservation that spans three million acres and includes most of the city of Tulsa, but the Court's reasoning portends that there are four more such reservations in Oklahoma. The rediscovered reservations encompass the entire eastern half of the State—19 million acres that are home to 1.8 million people, only 10%–15% of whom are Indians.

Across this vast area, the State's ability to prosecute serious crimes will be hobbled and decades of past convictions could well be thrown out. On top of that, the Court has profoundly destabilized the governance of eastern Oklahoma. The decision today creates significant uncertainty for the State's continuing authority over any area that touches Indian affairs, ranging from zoning and taxation to family and

environmental law.

None of this is warranted. What has gone unquestioned for a century remains true today: A huge portion of Oklahoma is not a Creek Indian reservation. Congress disestablished any reservation in a series of statutes leading up to Oklahoma statehood at the turn of the 19th century. The Court reaches the opposite conclusion only by disregarding the "well settled" approach required by our precedents. *Nebraska* v. *Parker*, 577 U. S. 481, ___ (2016) (slip op., at 5).

Under those precedents, we determine whether Congress intended to disestablish a reservation by examining the relevant Acts of Congress and "all the [surrounding] circumstances," including the "contemporaneous and subsequent understanding of the status of the reservation." *Id.*, at ___ (slip op., at 6) (internal quotation marks omitted). Yet the Court declines to consider such understandings here, preferring to examine only individual statutes in isolation.

Applying the broader inquiry our precedents require, a reservation did not exist when McGirt committed his crimes, so Oklahoma had jurisdiction to prosecute him. I respectfully dissent.

I

The Creek Nation once occupied what is now Alabama and Georgia. In 1832, the Creek were compelled to cede these lands to the United States in exchange for land in present day Oklahoma. The expanse set aside for the Creek and the other Indian nations that composed the "Five Civilized Tribes"—the Cherokees, Chickasaws, Choctaws, and Seminoles—became known as Indian Territory. See F. Cohen, Handbook of Federal Indian Law §4.07(1)(a), pp. 289–290 (N. Newton ed. 2012) (Cohen). Each of the Five Tribes formed a tripartite system of government. See *Marlin* v. *Lewallen*, 276 U. S. 58, 60 (1928). They "enact[ed] and execut[ed] their own laws," "punish[ed] their own criminals," and "rais[ed] and expend[ed] their own revenues." *Atlantic*

*& Pacific R. Co.* v. *Mingus*, 165 U. S. 413, 436 (1897).

The Five Tribes also enjoyed unique property rights. While many tribes held only a "right of occupancy" on lands owned by the United States, *United States* v. *Creek Nation*, 295 U. S. 103, 109 (1935), each of the Five Tribes possessed title to its lands in communal fee simple, meaning the lands were "considered the property of the whole." *E.g.*, Treaty with the Creeks, Arts. III and IV, Feb. 14, 1833, 7 Stat. 419; see *Marlin*, 276 U. S., at 60. Congress promised the Tribes that their lands would never be "included within, or annexed to, any Territory or State," see, *e.g.*, Treaty with Creeks and Seminoles, Art. IV, Aug. 7, 1856, 11 Stat. 700 (1856 Treaty), and that their new homes would be "forever secure," Indian Removal Act, §3, 4 Stat. 412; see also Treaty with the Creeks, Arts. I and XIV, Mar. 24, 1832, 7 Stat. 368.

Forever, it turns out, did not last very long, because the Civil War disrupted both relationships and borders. The Five Tribes, whose members collectively held at least 8,000 slaves, signed treaties of alliance with the Confederacy and contributed forces to fight alongside Rebel troops. See Gibson, Native Americans and the Civil War, 9 Am. Indian Q. 4, 385, 388–389, 393 (1985); Doran, Negro Slaves of the Five Civilized Tribes, 68 Annals Assn. Am. Geographers 335, 346–347, and Table 3 (1978); Cohen §4.07(1)(a), at 289. After the war, the United States and the Tribes formed new treaties, which required each Tribe to free its slaves and allow them to become tribal citizens. *E.g.*, Treaty with the Creek Indians, Art. II, June 14, 1866, 14 Stat. 786 (1866 Treaty); see Cohen §4.07(1)(a), at 289, and n. 9. The treaties also stated that the Tribes had "ignored their allegiance to the United States" and "unsettled the [existing] treaty relations," thereby rendering themselves "liable to forfeit" all "benefits and advantages enjoyed by them"—including their lands. *E.g.*, 1866 Treaty, Preamble, 14 Stat. 785. Due to "said liabilities," the treaties departed from prior promises and required each Tribe to give up the "west half" of its

"entire domain." *E.g.*, Preamble and Art. III, *id.*, at 785–786. These western lands became the Oklahoma Territory. As before, the new treaties promised that the reduced Indian Territory would be "forever set apart as a home" for the Tribes. *E.g.*, Art. III, *id.,* at 786.[1]

Again, however, it was not to last. In the wake of the war, a renewed "determination to thrust the nation westward" gripped the country. Cohen §1.04, at 71. Spurred by new railroads and protected by the repurposed Union Army, settlers rapidly transformed vast stretches of territorial wilderness into farmland and ranches. See *id.*, at 71–74. The Indian Territory was no exception. By 1900, over 300,000 settlers had poured in, outnumbering members of the Five Tribes by over 3 to 1. See H. R. Rep. No. 1762, 56th Cong., 1st Sess., 1 (1900). There to stay, the settlers founded "[f]lourishing towns" along the railway lines that crossed the territory. S. Rep. No. 377, 53d Cong., 2d Sess., 6 (1894).

Coexistence proved complicated. The new towns had no municipal governments or the things that come with them—laws, taxes, police, and the like. See H. R. Doc. No. 5, 54th Cong., 1st Sess., 89 (1895). No one had meaningful access to private property ownership, as the unique communal titles of the Five Tribes precluded ownership by Indians and non-Indians alike. Despite the millions of dollars that had been invested in the towns and farmlands, residents had no durable claims to their improvements. *Ibid.* Members of the Tribes were little better off, as the

---

[1] I assume that the Creek Nation's territory constituted a "reservation" at this time. See *ante*, at 5–6. The State contends that no reservation existed in the first place because the territory instead constituted a "dependent Indian communit[y]." Brief for Respondent 8 (quoting 18 U. S. C. §1151(b)). The United States disagrees and states that defining the territory as a dependent Indian community could disrupt the application of various federal statutes. Tr. of Oral Arg. 79–80. I do not address this debate because, regardless, I conclude that any reservation was disestablished.

Tribes failed to hold the communal lands for the "equal benefit" of all members. *Woodward* v. *De Graffenried*, 238 U. S. 284, 297 (1915). Instead, a few "enterprising citizens" of the Tribes "appropriate[d] to their exclusive use almost the entire property of the Territory that could be rendered profitable." *Id.*, at 297, 299, n. 1 (internal quotation marks omitted). As a result, "the poorer class of Indians [were] unable to secure enough lands for houses and farms," and "the great body of the tribe derive[d] no more benefit from their title than the neighbors in Kansas, Arkansas, or Missouri." *Id.*, at 299–301, n. 1 (emphasis deleted; internal quotation marks omitted).

Attuned to these new realities, Congress decided that it could not maintain an Indian Territory predicated on "exclusion of the Indians from the whites." S. Rep. No. 377, at 6. Congress therefore set about transforming the Indian Territory into a State.

Congress began by establishing a uniform body of law applicable to all occupants of the territory, regardless of race. To apply these laws, Congress established the U. S. Courts for the Indian Territory. Next Congress systematically dismantled the tribal governments. It abolished tribal courts, hollowed out tribal lawmaking power, and stripped tribal taxing authority. Congress also eliminated the foundation of tribal sovereignty, extinguishing the Creek Nation's title to the lands. Finally, Congress made the tribe members citizens of the United States and incorporated them in the drafting and ratification of the constitution for their new State, Oklahoma.

In taking these transformative steps, Congress made no secret of its intentions. It created a commission tasked with extinguishing the Five Tribes' territory and, in one report after another, explained that it was creating a homogenous population led by a common government. That contemporaneous understanding was shared by the tribal leadership

and the State of Oklahoma.  The tribal leadership acknowl-
edged that its only remaining power was to parcel out the
last of its land, and the State assumed jurisdiction over
criminal cases that, if a reservation had continued to exist,
would have belonged in federal court.

A century of practice confirms that the Five Tribes' prior
domains were extinguished.  The State has maintained un-
questioned jurisdiction for more than 100 years.  Tribe
members make up less than 10%–15% of the population of
their former domain, and until a few years ago the Creek
Nation itself acknowledged that it no longer possessed the
reservation the Court discovers today.  This on-the-ground
reality is enshrined throughout the U. S. Code, which re-
peatedly terms the Five Tribes' prior holdings the "former"
Indian reservations in Oklahoma.  As the Tribes, the State,
and Congress have recognized from the outset, those "res-
ervations were destroyed" when "Oklahoma entered the
Union."  S. Rep. No. 101–216, pt. 2, p. 47 (1989).

## II

Much of this important context is missing from the
Court's opinion, for the Court restricts itself to viewing each
of the statutes enacted by Congress in a vacuum.  That ap-
proach is wholly inconsistent with our precedents on reser-
vation disestablishment, which require a highly contextual
inquiry.  Our "touchstone" is congressional "purpose" or "in-
tent."  *South Dakota* v. *Yankton Sioux Tribe*, 522 U. S. 329,
343 (1998).  To "decipher Congress' intention" in this spe-
cialized area, we are instructed to consider three categories
of evidence: the relevant Acts passed by Congress; the con-
temporaneous understanding of those Acts and the histori-
cal context surrounding their passage; and the subsequent
understanding of the status of the reservation and the pat-
tern of settlement there.  *Solem* v. *Bartlett*, 465 U. S. 463,
470–472 (1984).  The Court resists calling these "steps," be-

cause "the only 'step' proper for a court of law" is interpreting the laws enacted by Congress. *Ante*, at 17–18. Any label is fine with us. What matters is that these are categories of evidence that our precedents "direct[] us" to examine *in determining* whether the laws enacted by Congress disestablished a reservation. *Hagen* v. *Utah*, 510 U. S. 399, 410–411 (1994). Because those precedents are not followed by the Court today, it is necessary to describe several at length.[2]

In *Solem* v. *Bartlett*, 465 U. S. 463 (1984), a unanimous Court summarized the appropriate methodology. "Congress [must] clearly evince an intent to change boundaries before diminishment will be found." *Id.*, at 470 (internal quotation marks and alterations omitted). This inquiry first considers the "statutory language used to open the Indian lands," which is the "most probative evidence of congressional intent." *Ibid.* "Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unallotted opened lands." *Ibid.* But "explicit language of cession and unconditional compensation are not prerequisites" for a finding of disestablishment. *Id.*, at 471.

Second, we consider "events surrounding the passage of

-------

[2] Our precedents have generally considered whether Congress disestablished or diminished a reservation by enacting "surplus land Acts" that opened land to non-Indian settlement. Here Congress did much more than that, as I will explain. Even so, there is broad agreement among the parties, the United States, the Creek Nation, and even the Court that our precedents on surplus land Acts provide the governing framework for this case, so I proceed on the same course. See Brief for Petitioner 1; Brief for Respondent 29, 35, 40; Brief for United States as *Amicus Curiae* 4–5; Brief for Muscogee (Creek) Nation as *Amicus Curiae* 1–2; *ante*, at 7–8, 18–19.

[an] Act—particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative Reports presented to Congress." *Ibid.* When such materials "unequivocally reveal a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation," we will "infer that Congress shared the understanding that its action would diminish the reservation," even in the face of "statutory language that would otherwise suggest reservation boundaries remained unchanged." *Ibid.*

Third, to a "lesser extent," we examine "events that occurred after the passage of [an] Act to decipher Congress' intentions." *Ibid.* "Congress' own treatment of the affected areas, particularly in the years immediately following the opening, has some evidentiary value, as does the manner in which the Bureau of Indian Affairs and local judicial authorities dealt with [the areas]." *Ibid.* In addition, "we have recognized that who actually moved onto opened reservation lands is also relevant." *Ibid.* "Where non-Indian settlers flooded into the opened portion of a reservation and the area has long since lost its Indian character, we have acknowledged that *de facto*, if not *de jure*, diminishment may have occurred." *Ibid.* This "subsequent demographic history" provides an "additional clue as to what Congress expected would happen." *Id.*, at 471–472.

Fifteen years later, another unanimous Court described the same methodology more pithily in *South Dakota* v. *Yankton Sioux Tribe*, 522 U. S. 329 (1998). First, the Court reiterated that the "most probative evidence of diminishment is, of course, the statutory language." *Id.*, at 344 (internal quotation marks omitted). The Court continued that it would also consider, second, "the historical context surrounding the passage of the . . . Acts," and third, "the subsequent treatment of the area in question and the pattern of settlement there." *Ibid.* (quoting *Hagen*, 510 U. S., at 411).

The Court today treats these precedents as aging relics
in need of "clarif[ication]." *Ante*, at 19. But these prece-
dents have been clear enough for some time. Just a few
Terms ago, the same inquiry was described as "well settled"
by the unanimous Court in *Nebraska* v. *Parker*, 577 U. S.
481, \_\_\_ (2016) (slip op., at 5). First, the Court explained,
"we start with the statutory text." *Ibid.* "Under our prece-
dents," the Court continued, "we also 'examine all the cir-
cumstances surrounding the opening of a reservation.'" *Id.,*
at \_\_\_ (slip op., at 6) (quoting *Hagen*, 510 U. S., at 412).
Thus, second and third, we "look to any unequivocal evi-
dence of the contemporaneous and subsequent understand-
ing of the status of the reservation by members and non-
members, as well as the United States and the State." 577
U. S., at \_\_\_ (slip op., at 6) (internal quotation marks omit-
ted). These inquiries include, respectively, the "history sur-
rounding the passage of the [relevant] Act" as well as the
subsequent "demographic history" and "treatment" of the
lands at issue. *Id.*, at \_\_\_, \_\_\_ (slip op., at 8, 10).

Today the Court does not even discuss the governing ap-
proach reiterated throughout these precedents. The Court
briefly recites the general rule that disestablishment re-
quires clear congressional "intent," *ante*, at 8, but the Court
then declines to examine the categories of evidence that our
precedents demand we consider. Instead, the Court argues
at length that allotment alone is not enough to disestablish
a reservation. *Ante*, at 8–12. Then the Court argues that
the "many" "serious blows" dealt by Congress to tribal gov-
ernance, and the creation of the new State of Oklahoma, are
each insufficient for disestablishment. *Ante*, at 13–16.
Then the Court emphasizes that "historical practices or cur-
rent demographics" do not "by themselves" "suffice" to dis-
establish a reservation. *Ante*, at 17–18.

This is a school of red herrings. No one here contends
that any individual congressional action or piece of evi-

dence, standing alone, disestablished the Creek reserva-
tion. Rather, Oklahoma contends that all of the relevant
Acts of Congress together, viewed in light of contemporane-
ous and subsequent contextual evidence, demonstrate Con-
gress's intent to disestablish the reservation. "[O]ur tradi-
tional approach . . . *requires* us" to determine Congress's
intent by "examin[ing] *all* the circumstances surrounding
the opening of a reservation." *Hagen*, 510 U. S., at 412 (em-
phasis added). Yet the Court refuses to confront the cumu-
lative import of all of Congress's actions here.

The Court instead announces a new approach sharply re-
stricting consideration of contemporaneous and subsequent
evidence of congressional intent. The Court states that
such "extratextual sources" may be considered in "only" one
narrow circumstance: to help "'clear up'" ambiguity in a
particular "statutory term or phrase." *Ante*, at 17–18, 20
(quoting *Milner* v. *Department of Navy*, 562 U. S. 562, 574
(2011), and citing *New Prime Inc.* v. *Oliveira*, 586 U. S. ___,
___ (2019) (slip op., at 6)).

But, if that is the right approach, what have we been do-
ing all these years? Every single one of our disestablish-
ment cases has considered extratextual sources, and in do-
ing so, none has required the identification of ambiguity in
a particular term. That is because, while it is well estab-
lished that Congress's "intent" must be "clear," *ante,* at 20
(quoting *Yankton Sioux Tribe*, 522 U. S., at 343), in this
area we have expressly held that the appropriate inquiry
does not focus on the statutory text alone.

Today the Court suggests that only the text can satisfy
the longstanding requirement that Congress "explicitly in-
dicate[]" its intent. *Ante,* at 20 (quoting *Solem*, 465 U. S.,
at 470). The Court reiterates that a reservation persists
unless Congress "said otherwise," *ante*, at 1; if Congress
wishes to disestablish a reservation, "it must say so," with
the right "language." *Ante*, at 8, 18; see *ante*, at 42 (same).

Our precedents disagree. They explain that disestablishment can occur "[e]ven in the absence of a clear expression of congressional purpose in the text of [the] Act." *Yankton Sioux Tribe*, 522 U. S., at 351. The "notion" that "express language in an Act is the *only* method by which congressional action may result in disestablishment" is "quite inconsistent" with our precedents. *Rosebud Sioux Tribe* v. *Kneip*, 430 U. S. 584, 586, 588, n. 4 (1977); see *Solem*, 465 U. S., at 471 (intent may be discerned from a "widely held, contemporaneous understanding," "notwithstanding the presence of statutory language that would otherwise suggest reservation boundaries remained unchanged"); see also *DeCoteau* v. *District County Court for Tenth Judicial Dist.*, 420 U. S. 425, 444 (1975); *Mattz* v. *Arnett*, 412 U. S. 481, 505 (1973).

These are not "stiche[d] together quotes" but rather plain language reflecting a consistent theme running through our precedents. *Ante*, at 20, n. 9. They make clear that the Court errs in focusing on whether "a statute" alone "required" disestablishment, *ante,* at 20; under these precedents, we cannot determine what Congress "required" without first considering evidence in addition to the relevant statutes. Oddly, the Court claims these precedents actually support its new approach because they "emphasize that '[t]he focus of our inquiry is congressional intent.'" *Ante,* at 20–21, n. 9 (quoting *Rosebud Sioux Tribe*, 430 U. S., at 588, n. 4, and citing *Yankton Sioux Tribe*, 522 U. S., at 343). But in this context that intent is determined by examining a broad array of evidence—"all the circumstances." *Parker*, 577 U. S., at ___ (slip op., at 6) (quoting *Hagen*, 510 U. S., at 412). Unless the Court is prepared to overrule these precedents, it should follow them.

The Court appears skeptical of these precedents, but does not address the compelling reasons they give for considering extratextual evidence. At the turn of the century, the possibility that a reservation might persist in the absence

of "tribal ownership" of the underlying lands was "unfamiliar," and the prevailing "assumption" was that "Indian reservations were a thing of the past." *Solem*, 465 U. S., at 468. Congress believed "to a man" that "within a short time" the "Indian tribes would enter traditional American society and the reservation system would cease to exist." *Ibid.* As a result, Congress—while intending disestablishment—did not always "detail" precise changes to reservation boundaries. *Ibid.* Recognizing this distinctive backdrop, our precedents determine Congress's intent by considering a broader variety of evidence than we might for more run-of-the-mill questions of statutory interpretation. See *id.*, at 468–469; *Parker*, 577 U. S., at ___ (slip op., at 6); *Yankton Sioux Tribe*, 522 U. S., at 343. See also Cohen §2.02(1), at 113 ("The theory and practice of interpretation in federal Indian law differs from that of other fields of law.").

The Court next claims that *Parker* "clarif[ied]" that evidence of the subsequent treatment of the disputed land by government officials "'has limited interpretive value.'" *Ante*, at 19 (quoting *Parker*, 577 U. S., at ___ (slip op., at 11)). But *Parker* held that the subsequent evidence *in that case* "ha[d] 'limited interpretive value,'" as in the case that *Parker* relied on. 577 U. S., at ___–___ (slip op., at 11–12) (quoting *Yankton Sioux Tribe*, 522 U. S., at 355). The adequacy of evidence in a particular case says nothing about whether our precedents require us to consider such evidence in others.[3]

_____

[3] The Court rejects this reading of *Parker* based on a quotation that ends with what sounds like a general principle that "[e]vidence of the subsequent treatment of the disputed land by Government officials likewise has 'limited interpretive value.'" *Ante*, at 19, n. 8 (quoting *Parker*, 577 U. S., at ___ (slip op., at 11)). But that sentence was actually the topic sentence of a new paragraph that addressed the *particular* evidence of subsequent treatment of the *particular* land by the *particular* government officials in that case. *Id.*, at ___–___ (slip op., at 11–12). It is clear

The Court finally resorts to torching strawmen. No one relying on our precedents contends that "practical advantages" require "ignoring the written law." *Ante*, at 27. No one claims a State has "authority to reduce federal reservations." *Ante*, at 7. No one says the role of courts is to "sav[e] the political branches" from "embarrassment." *Ibid.* No one argues that courts can "adjust[ ]" reservation borders. *Ibid.* Such notions have nothing to do with our precedents. What our precedents do provide is the settled approach for determining whether Congress disestablished a reservation, and the Court starkly departs from that approach here.

## III

Applied properly, our precedents demonstrate that Congress disestablished any reservation possessed by the Creek Nation through a relentless series of statutes leading up to Oklahoma statehood.

## A

The statutory texts are the "most probative evidence" of congressional intent. *Parker*, 577 U. S., at \_\_\_ (slip op., at 5) (quoting *Hagen*, 510 U. S., at 411). The Court appropriately examines the Original Creek Agreement of 1901 and a subsequent statute for language of disestablishment, such as "cession," "abolish[ing]" the reservation, "restor[ing]" land to the "public domain," or an "unconditional commitment" to "compensate" the Tribe. *Ante*, at 8–12 (internal quotation marks omitted). But that is only the beginning

_____

that *Parker* merely concluded that the evidence cited by the parties provided a "mixed record of subsequent treatment" that did not move the needle either way. *Ibid.* (internal quotation marks omitted). *Parker* did not silently overturn our precedents requiring us to consider—and accord "weight" to—subsequent evidence that plainly favors, or undermines, disestablishment. *Rosebud Sioux Tribe* v. *Kneip*, 430 U. S. 584, 604 (1977); see *supra,* at 6–9.

of the analysis; there is no "magic words" requirement for disestablishment, and each individual statute may not be considered in isolation. See *supra,* at 10–11; *Hagen*, 510 U. S., at 411, 415–416 (when two statutes "buil[d]" on one another in this area, "[both] statutes—as well as those that came in between—must therefore be read together"); see also *Rosebud Sioux Tribe*, 430 U. S., at 592 (recognizing that a statute "cannot, and should not, be read as if it were the first time Congress had addressed itself to" disestablishment when prior statutes also indicate congressional intent). In this area, "we are not free to say to Congress: 'We see what you are driving at, but you have not said it, and therefore we shall go on as before.'" *Id.*, at 597 (quoting *Johnson* v. *United States*, 163 F. 30, 32 (CA1 1908) (Holmes, J.)). Rather, we recognize that the language Congress uses to accomplish its objective is adapted to the circumstances it confronts.

For example, "cession" is generally what a tribe does when it conveys land to a fellow sovereign, such as the United States or another tribe. See *Mitchel* v. *United States*, 9 Pet. 711, 734 (1835); *e.g.*, 1856 Treaty, Art. I, 11 Stat. 699. But here, given that Congress sought direct allotment to tribe members in order to enable private ownership by both Indians and the 300,000 settlers in the territory, it would have made little sense to "cede" the lands to the United States or "restore" the lands to the "public domain," as Congress did on other occasions. So too with a "commitment" to "compensate" the Tribe. Rather than buying land from the Creek, Congress provided for allotment to tribe members who could then "sell their land to Indians and non-Indians alike." *Ante*, at 10; see *Hagen*, 510 U. S., at 412 (a "definite payment" is not required for disestablishment). That other allotment statutes have contained various "hallmarks" of disestablishment tells us little about Congress's intent here. Contra, *ante,* at 12–13, and n. 5. "[W]e have never required any particular form of words" to

disestablish a reservation. *Hagen*, 510 U. S., at 411. There are good reasons the statutes here do not include the language the Court looks for, and those reasons have nothing to do with a failure to disestablish the reservation. Respect for Congress's work requires us to look at what it actually did, not search in vain for what it might have done or did on other occasions.

What Congress actually did here was enact a series of statutes beginning in 1890 and culminating with Oklahoma statehood that (1) established a uniform legal system for Indians and non-Indians alike; (2) dismantled the Creek government; (3) extinguished the Creek Nation's title to the lands at issue; and (4) incorporated the Creek members into a new political community—the State of Oklahoma. These statutes evince Congress's intent to terminate the reservation and create a new State in its place.

First, Congress supplanted the Creek legal system with a legal code and court system that applied equally to Indians and non-Indians. In 1890, Congress subjected the Indian Territory to specified federal criminal laws. Act of May 2, 1890, §31, 26 Stat. 96. For offenses not covered by federal law, Congress did what it often did when establishing a new territorial government. It provided that the criminal laws from a neighboring State, here Arkansas, would apply. §33, *id.*, at 96–97. Seven years later, Congress provided that the laws of the United States and Arkansas "shall apply to *all* persons" in Indian Territory, "*irrespective of race.*" Act of June 7, 1897 (1897 Act), 30 Stat. 83 (emphasis added). In the same Act, Congress conferred on the U. S. Courts for the Indian Territory "exclusive jurisdiction" over "all civil causes in law and equity" and "all criminal causes" for the punishment of offenses committed by "any person" in the Indian Territory. *Ibid.*

The following year, the 1898 Curtis Act "abolished" all tribal courts, prohibited all officers of such courts from ex-

ercising "any authority" to perform "any act" previously authorized by "any law," and transferred "all civil and criminal causes then pending" to the U. S. Courts for the Indian Territory. Act of June 27, 1898 (Curtis Act), §28, *id.,* at 504–505. In the same Act, Congress completed the shift to a uniform legal order by banning the enforcement of tribal law in the newly exclusive jurisdiction of the U. S. Courts. See §26, *id.*, at 504 ("[T]he laws of the various tribes or nations of Indians shall not be enforced at law or in equity by the courts of the United States in the Indian Territory."). Congress reiterated yet again in 1904 that Arkansas law "continued" to "embrace *all* persons and estates" in the territory—"whether Indian, freedmen, or otherwise." Act of Apr. 28, 1904, ch. 1824, §2, 33 Stat. 573 (emphasis added). In this way, Congress replaced tribal law with local law in matters at the core of tribal governance, such as inheritance and marital disputes. See, *e.g.*, *George* v. *Robb*, 4 Ind. T. 61, 64 S. W. 615, 615–616 (1901); *Colbert* v. *Fulton*, 74 Okla. 293, 157 P. 1151, 1152 (1916).

In addition, the Curtis Act established municipalities to govern both Indians and non-Indians. It authorized "any city or town" with at least 200 residents to incorporate. §14, 30 Stat. 499. The Act gave incorporated towns "all the powers" and "all the rights" of municipalities under Arkansas law. *Ibid.* "All male inhabitants," including Indians, were deemed qualified to vote in town elections. *Ibid.* And "all inhabitants"—"*without regard to race*"—were made subject to "all" town laws and were declared to possess "*equal* rights, privileges, and protection." *Id.*, at 499–500 (emphasis added). These changes reorganized the approximately 150 towns in the territory—including Tulsa, Muskogee, and 23 others within the Creek Nation's former territory—that were home to tens of thousands of people and nearly one third of the territory's population at the time, laying the foundation for the state governance that was to come. See H. R. Doc. No. 5, 57th Cong., 2d Sess., pt. 2, pp. 299–300,

Table 1 (1903); Depts. of Commerce and Labor, Bureau of Census, Population of Oklahoma and Indian Territory 1907, pp. 8, 30–33.

Second, Congress systematically dismantled the governmental authority of the Creek Nation, targeting all three branches. As noted, Congress dissolved the Tribe's judicial system. Congress also specified in the Original Creek Agreement that the Creek government would "not continue" past March 1906, essentially preserving it only as long as Congress thought necessary for the Tribe to wind up its affairs. §46, 31 Stat. 872. In the meantime, Congress radically curtailed tribal legislative authority, providing that no statute passed by the council of the Creek Nation affecting the Nation's lands, money, or property would be valid unless approved by the President of the United States. §42, *id.*, at 872. When 1906 came around, the Five Tribes Act provided for the "final disposition of the affairs of the Five Civilized Tribes." Act of Apr. 26, 1906, ch. 1876, 34 Stat. 137. Along with "abolish[ing]" all tribal taxes, the Act directed the Secretary of the Interior to assume control over the collection of the Nation's remaining revenues and to distribute them among tribe members on a per capita basis. §§11, 17, *id.*, at 141, 143–144. Thus, by the time Oklahoma became the 46th State in 1907, there was little left of the Creek Nation's authority: No tribal courts. No tribal law. No tribal fisc. And any lingering authority was further reduced in 1908, when Congress amended the Five Tribes Act to require tribal officers and members to surrender all remaining tribal property, money, and records. Act of May 27, 1908, §13, 35 Stat. 316.

The Court stresses that the Five Tribes Act separately stated that the Creek government was "continued" in "full force and effect for all purposes authorized by law." *Ante*, at 15 (quoting §28, 34 Stat. 148). By that point, however, such "authorized" purposes were nearly nonexistent, and the Act's statement is readily explained by the need to

maintain a tribal body to wrap up the distribution of Creek lands. Indeed, the Court does not cite any examples of the Creek Nation exercising significant government authority in the wake of the statutes discussed above. Instead, the Court alludes to subsequent changes in the 1920s to the general "federal outlook towards Native Americans," and it observes that in the 1930s Congress authorized the Creek Nation to reconstitute its tribal courts and adopt a constitution and bylaws. *Ante*, at 15. That, however, simply highlights the drastic extent to which Congress erased the Nation's authority at the turn of the century.

Third, Congress destroyed the foundation of sovereignty by stripping the Creek Nation of its territory. The communal title held by the Creek Nation, which "did not recognize private property in land," "presented a serious obstacle to the creation of [a] State." *Choate* v. *Trapp*, 224 U. S. 665, 667 (1912). Well aware of this impediment, Congress established the Dawes Commission and directed it to negotiate with the Five Tribes for "the extinguishment of the national or tribal title to any lands" within the Indian Territory. Act of Mar. 3, 1893, §16, 27 Stat. 645. That extinguishment could be accomplished through "cession" of the tribal lands to the United States, "allotment" of the lands among the Indians, or any other agreed upon method. *Ibid.* The Commission initially sought cession, but ultimately sought to extinguish the title through allotment. See *ante*, at 9.

In the Original Creek Agreement of 1901, Congress did just that. The agreement provided that "*[a]ll lands* belonging to the Creek tribe," except town sites and lands reserved for schools and public buildings, "shall be allotted among the citizens of the tribe." §§2, 3, 31 Stat. 862 (emphasis added). Town sites, rather than being allotted, were made available for purchase by the non-Indians residing there. §§11–16, *id.*, at 866–867. Unclaimed lots were to be sold at public auction, with the proceeds divvied up among the

Creeks. §§11, 14, *id.*, at 866. The agreement required that the deeds for the allotments and town site purchases convey "all right, title, and interest of the Creek Nation and of all other [Creek] citizens," and that the deeds be executed by the leader of the Creek Nation (the "principal chief"). §23, *id.*, at 867–868. The conveyances were then approved by the Secretary of the Interior, who in turn "relinquish[ed] to the grantee . . . all the right, title, and interest of the United States" in the land. *Id.*, at 868. In this way, Congress provided for the complete termination of the Creek Nation's interest in the lands, as well as the interests of individual Creek members apart from their personal allotments. Indeed, the language Congress used in the Original Creek Agreement resembles what the Court regards as model disestablishment language. See *ante*, at 8, 10 (looking for language evincing "the present and total surrender of all tribal interests in the affected lands" (internal quotation marks omitted)). And, making even more clear its intent to place Indian-held land under the same laws as all other property, Congress subsequently eliminated restrictions on the alienation of allotments, freeing tribe members "to sell their land to Indians and non-Indians alike." *Ante*, at 10.

In addition, while the Original Creek Agreement did not allot lands reserved for schools and tribal buildings, the Creek Nation's interest in those lands was subsequently terminated by the Five Tribes Act. That Act directed the Secretary of the Interior to take possession of—and sell off—"all" tribal buildings and underlying lands, whether used for "governmental" or "other tribal purposes." §15, 34 Stat. 143. The Secretary was also ordered to assume control of all tribal schools and the underlying property until the federal or state governments established a public school system. See §10, *id.*, at 140–141.

These statutes evince a clear intent to leave the Creek Nation with no communally held land and no meaningful governing authority to exercise over the newly distributed

parcels. Contrary to the Court's portrayal, this is not a scenario in which Congress allowed a tribe to "continue to exercise governmental functions over land" that it "no longer own[ed] communally." *Ante*, at 11. From top to bottom, these statutes, which divested the Tribes and the United States of their interests while displacing tribal governance, "strongly suggest[] that Congress meant to divest" the lands of reservation status. *Solem*, 465 U. S., at 470.

Finally, having stripped the Creek Nation of its laws, its powers of self-governance, and its land, Congress incorporated the Nation's members into a new political community. Congress made "every Indian" in the Oklahoma territory a citizen of the United States in 1901—decades before conferring citizenship on all native born Indians elsewhere in the country. Act of Mar. 3, 1901, ch. 868, 31 Stat. 1447. In the Oklahoma Enabling Act of 1906—the gateway to statehood—Congress confirmed that members of the Five Tribes would participate in equal measure alongside non-Indians in the choice regarding statehood. The Act gave Indians the right to vote on delegates to a constitutional convention and ultimately on the state constitution that the delegates proposed. §§2, 4, 34 Stat. 268, 271. Fifteen members of the Five Tribes were elected as convention delegates, many of them served on significant committees, and a member of the Chickasaw Nation even served as president of the convention. See Brief for Seventeen Oklahoma District Attorneys et al. as *Amici Curiae* 9–13.

The Enabling Act also ensured that Indians and non-Indians would be subject to uniform laws and courts. It replaced Arkansas law, which had applied to all persons "irrespective of race," 1897 Act, 30 Stat. 83, with the laws of the adjacent Oklahoma Territory until the new state legislature provided otherwise. Enabling Act §§2, 13, 21, 34 Stat. 268–269, 275, 277–278; see *Jefferson* v. *Fink*, 247 U. S. 288, 294 (1918). All of the pending cases in the territorial courts arising under federal law were transferred to

the newly created U. S. District Courts of Oklahoma. See §16, 34 Stat. 276. Pending cases not involving federal law, including those that involved Indians on Indian land and had arisen under Arkansas law, were transferred to the new Oklahoma state courts. §§16, 17, 20, *id.*, at 276–277. To dispel any potential confusion about the distribution of criminal cases, Congress amended the Enabling Act the following year, clarifying that all cases for crimes that would have fallen under federal jurisdiction had they been committed in a State would be transferred to the U. S. District Courts. Act of Mar. 4, 1907, §1, *id.*, at 1286–1287. All other pending criminal cases would be "prosecuted to a final determination in the State courts of Oklahoma." §3, *id.*, at 1287. As for civil cases, the new state courts were immediately empowered to resolve even disputes that previously lay at the core of tribal self-governance. *E.g.*, *Palmer* v. *Cully*, 52 Okla. 454, 463–469, 153 P. 154, 157–158 (1915) (*per curiam*) (marital dispute).[4]

In sum, in statute after statute, Congress made abundantly clear its intent to disestablish the Creek territory. The Court, for purposes of the disestablishment question before us, defines the Creek territory as "lands that would lie outside both the legal jurisdiction and geographic boundaries of any State" and on which a tribe was "assured a right to self-government." *Ante*, at 6. That territory was eliminated. By establishing uniform laws for Indians and non-

―――――――

[4] The Court, citing *United States* v. *Sandoval*, 231 U. S. 28, 47–48 (1913), argues that including a tribe within a new State is not necessarily incompatible with the continuing existence of a reservation. *Ante*, at 15–16, n. 6. But the tribe in *Sandoval*, the Pueblo Indians of New Mexico, retained a rare communal title to their lands—which Congress explicitly extinguished here. 231 U. S., at 47. More fundamentally, the Court's argument suffers from the same flaw that runs through its entire approach, which maintains that each of Congress's actions alone would not be enough for disestablishment but never confronts the import of all of them.

Indians alike in the new State of Oklahoma, Congress brought Creek members and the land on which they resided under state jurisdiction. By stripping the Creek Nation of its courts, lawmaking authority, and taxing power, Congress dismantled the tribal government. By extinguishing the Nation's title, Congress erased the geographic boundaries that once defined Creek territory. And, by conferring citizenship on tribe members and giving them a vote in the formation of the State, Congress incorporated them into a new political community. "Under any definition," that was disestablishment. *Ibid.*

In the face of all this, the Court claims that recognizing Congress's intent would permit disestablishment in the absence of "a statute requir[ing] that result." *Ante*, at 20. Hardly. The numerous statutes discussed above demonstrate Congress's plain intent to terminate the reservation. The Court resists the cumulative force of these statutes by attacking each in isolation, first asking whether allotment alone disestablished the reservation, then whether restricting tribal governance was sufficient, and so on. But the Court does not consider the full picture of what Congress accomplished. Far from justifying its blinkered approach, the Court repeatedly tells the reader to wait until the "*next* section" of the opinion—where the Court will again nitpick discrete aspects of Congress's disestablishment effort while ignoring the full picture our precedents require us to honor. *Ante*, at 12–13, n. 5, 17, n. 7; see *supra,* at 11, 14.

The Court also hypothesizes that Congress may have taken significant steps toward disestablishment but ultimately could not "complete[]" it; perhaps Congress just couldn't "muster the will" to finish the job. *Ante*, at 8, 15. The Court suggests that Congress sought to "tiptoe to the edge of disestablishment," fearing the "embarrassment of disestablishing a reservation" but hoping that judges would "deliver the final push." *Ante*, at 7. This is fantasy. The congressional Acts detailed above do not evince any unease

about extinguishing the Creek domain, or any shortage of "will." Quite the opposite. Through an open and concerted effort, Congress did what it set out to do: transform a reservation into a State. "Mustering the broad social consensus required to pass new legislation is a deliberately hard business," as the Court reminds us. *Ibid.* Congress did that hard work here, enacting not one but a steady progression of major statutes. The Court today does not give effect to the cumulative significance of Congress's actions, because Congress did not use explicit words of the sort the Court insists upon. But Congress had no reason to suppose that such words would be required of it, and this Court has held that they were not. See *Hagen*, 510 U. S., at 411–412; *Yankton Sioux Tribe*, 522 U. S., at 351; *Solem*, 465 U. S., at 471.

## B

Under our precedents, we next consider the contemporaneous understanding of the statutes enacted by Congress and the subsequent treatment of the lands at issue. The Court, however, declines to consider such evidence because, in the Court's view, the statutes clearly do not disestablish any reservation, and there is no "ambiguity" to "clear up." *Ante*, at 20 (internal quotation marks omitted). That is not the approach demanded by our precedent, *supra*, at 10–13, and, in any event, the Court's argument fails on its own terms here. I find it hard to see how anyone can come away from the statutory texts detailed above with *certainty* that Congress had no intent to disestablish the territorial reservation. At the very least, the statutes leave some ambiguity, and thus "extratextual sources" ought to be consulted. *Ante*, at 20.

Turning to such sources, our precedents direct us to "examine all the circumstances" surrounding Congress's actions. *Parker*, 577 U. S., at \_\_\_ (slip op., at 6) (quoting *Hagen*, 510 U. S., at 412). This includes evidence of the

"contemporaneous understanding" of the status of the reservation and the "history surrounding the passage" of the relevant Acts. *Parker*, 577 U. S., at ___ (slip op., at 8) (internal quotation marks omitted); see *Yankton Sioux Tribe*, 522 U. S., at 351–354; *Solem*, 465 U. S., at 471. The available evidence overwhelmingly confirms that Congress eliminated any Creek reservation. That was the purpose identified by Congress, the Dawes Commission, and the Creek Nation itself. And that was the understanding demonstrated by the actions of Oklahoma, the United States, and the Creek.

According to reports published by Congress leading up to Oklahoma statehood, the Five Tribes had failed to hold the lands for the equal benefit of all Indians, and the tribal governments were ill equipped to handle the largescale settlement of non-Indians in the territories. See *supra*, at 4–5; *Woodward*, 238 U. S., at 296–297. The Senate Select Committee on the Five Tribes explained that it was "imperative[ ]" to "establish[ ] a government over [non-Indians] and Indians" in the territory "in accordance with the principles of our constitution and laws." S. Rep. No. 377, at 12–13. On the eve of the Original Creek Agreement, the House Committee on Indian Affairs emphasized that "[t]he independent self-government of the Five Tribes ha[d] practically ceased," "[t]he policy of the Government to abolish classes in Indian Territory and make a homogeneous population [wa]s being rapidly carried out," and all Indians "should at once be put upon a level and equal footing with the great population with whom they [were] intermingled." H. R. Rep. No. 1188, 56th Cong., 1st Sess., 1 (1900).

The Dawes Commission understood Congress's intent in the same way. The Commission explained that the "object of Congress from the beginning has been the dissolution of the tribal governments, the extinguishment of the communal or tribal title to the land, the vesting of possession and title in severalty among the citizens of the Tribes, and the

assimilation of the peoples and institutions of this Territory to our prevailing American standard." H. R. Doc. No. 5, 58th Cong., 2d Sess., pt. 2, p. 5 (1903). Accordingly, the Commission's aim—"in all [its] endeavors"—was a "uniformity of political institutions to lay the foundation for an ultimate common government." H. R. Doc. No. 5, 56th Cong., 2d Sess., 163 (1900).

The Creek shared the same understanding. In 1893, the year Congress formed the Dawes Commission, the Creek delegation to Washington recognized that Congress's "unwavering aim" was to "'wipe out the line of political distinction between an Indian citizen and other citizens of the Republic'" so that the Tribe could be "'absorbed and become a part of the United States.'" P. Porter & A. McKellop, Printed Statement of Creek Delegates, reprinted in Creek Delegation Documents 8–9 (Feb. 9, 1893) (quoting Senate Committee Report); see also S. Doc. No. 111, 54th Cong., 2d Sess., 5, 8 (1897) (resolution of the Creek Nation "recogniz[ing]" that Congress proposed to "disintegrat[e] the land of our people" and "transform[]" "our domestic dependent states" "into a State of the Union").

Particularly probative is the understanding of Pleasant Porter, the principal Chief of the Creek Nation. He described Congress's decisions to the Creek people and legislature in messages published in territorial newspapers during the run-up to statehood. Following the extinguishment of the Nation's title, dissolution of tribal courts, and curtailment of lawmaking authority, he told his people that "[i]t would be difficult, if not impossible to successfully operate the Creek government now." App. to Brief for Respondent 8a (Message to Creek National Council (May 7, 1901), reprinted in The Indian Journal (May 10, 1901)). The "remnant of a government" had been reduced to a land office for finalizing the distribution of allotments and would be "maintained only until" the Tribe's "landed and other interests . . . have been settled." App. to Brief for Respondent

8a. He reiterated this understanding following the Five Tribes Act of 1906, which stated that the tribal government would "continue[] in full force and effect for all purposes authorized by law." §28, 34 Stat. 148. While the Court believes that meant Congress decided against disestablishing the reservation, see *ante*, at 14–15, Chief Porter saw things differently. From his vantage point as the contemporaneous leader of the government at issue, Congress had temporarily continued the tribal government but left it with only "limited and circumscribed" authority: The council could "pass[ ] resolutions respecting our wishes" regarding the property "now in the process of distribution," but the council no longer had any authority to "mak[e] laws for our government." App. to Brief for Respondent 14a (Message to Creek National Council (Oct. 18, 1906), reprinted in The New State Tribune (Oct. 18, 1906)). Apart from distributing the Nation's property, Chief Porter maintained that "all powers over the governing even of our landed property will cease" once the new state government was established. App. to Brief for Respondent 15a; see also S. Rep. No. 5013, 59th Cong., 2d Sess., pt. 1, p. 885 (1907) (Choctaw governor mourning that his "only" remaining authority was "to sign deeds").

The Creek remained of that view after Oklahoma was officially made a State through the Enabling Act. At that point, the new principal Chief confirmed that it was "utterly impossible" to resume "our old tribal government." App. to Brief for Respondent 16a–17a (Address by Moty Tiger to Creek National Council (Oct. 8, 1908), reprinted in The Indian Journal (Oct. 9, 1908)). And any "appeal to the government at Washington to alter its purpose to wipe out all tribal government among the five civilized tribes" would "be to no purpose." App. to Brief for Respondent 16a. "[C]ontributions" for such efforts would be "just that much money thrown away," and "all attorneys at Washington or else-

where who encourage and receive any part of such contributions do it knowing that they can give no return or service for same and that they take such money fraudulently and dishonestly." *Id.*, at 17a.[5]

In addition to their words, the contemporaneous actions of Oklahoma, the Creek, and the United States in criminal matters confirm their shared understanding that Congress did not intend a reservation to persist. Had the land been a reservation, the federal government—not the new State— would have had jurisdiction over serious crimes committed by Indians under the Major Crimes Act of 1885. See §9, 23 Stat. 385. Yet, at statehood, Oklahoma immediately began prosecuting serious crimes committed by Indians in the new state courts, and the federal government immediately ceased prosecuting such crimes in federal court. At argument, McGirt's counsel acknowledged that he could not cite a single example of federal prosecutions for such crimes. Tr. of Oral Arg. 17–18. Rather, the record demonstrates that case after case was transferred to state court or filed there outright by Oklahoma after 1907—without objection by anyone. See, *e.g.*, *Bigfeather* v. *State*, 7 Okla. Crim. 364, 123 P. 1026 (1912) (manslaughter); *Rollen* v. *State*, 7 Okla. Crim. 673, 125 P. 1087 (1912) (assault with intent to kill); *Jones* v. *State*, 3 Okla. Crim. 593, 107 P. 738 (1910) (murder); see also Brief for Petitioner in *Carpenter* v. *Murphy*, O. T. 2018, No. 17–1107, pp. 40–41 (collecting more cases).

––––––––––

[5] The Court discounts the views of the principal chiefs as mere predictions about what Congress "*would*" do, *ante,* at 25, but the Court ignores statements made after statehood, describing what Congress *did* do. The Court also asserts that the chiefs' views cannot serve as "evidence" of the "meaning" of laws enacted by Congress. *Ante*, at 25, n. 12. That is inconsistent with our precedent, which specifically instructs us to determine Congress's intent by considering the "understanding of the status of the reservation by members" of the affected tribe. *Parker*, 577 U. S., at \_\_\_ (slip op., at 6). The contemporaneous understanding of the leaders of the tribe is highly probative.

These prosecutions were lawful, the Oklahoma Supreme Court recognized at the time, because Congress had not intended to "except out of [Oklahoma] an Indian reservation" upon its admission as a State. *Higgins* v. *Brown*, 20 Okla. 355, 419, 94 P. 703, 730 (1908).

Instead of explaining how everyone at the time somehow missed that a reservation still existed, the Court resorts to misdirection. It observes that Oklahoma state courts have held that they erroneously entertained prosecutions for crimes committed by Indians on the small number of remaining restricted allotments and tribal trust lands from the 1930s until 1989. But this Court has not addressed that issue, and regardless, it would not tell us whether the State properly prosecuted major crimes committed by Indians on the lands at issue here—the unrestricted fee lands that make up more than 95% of the Creek Nation's former territory. Perhaps most telling is that the State's jurisdiction over crimes on Indian allotments was hotly contested from an early date, whereas nobody raised objections based on a surviving reservation. See, *e.g.*, *Ex parte Nowabbi*, 60 Okla. Crim. 111, 61 P. 2d 1139 (1936), overruled by *State* v. *Klindt*, 782 P. 2d 401, 404 (Okla. Crim. App. 1989); see also *ante*, at 21 ("no court" suggested the "possibility" that "the Creek lands really were part of a reservation" until 2017).[6]

Lacking any other arguments, the Court suspects uniform lawlessness: The State must have "overstepped its authority" in prosecuting thousands of cases for over a century. *Ante*, at 23. Perhaps, the Court suggests, the State

---

[6] The Court claims that the Oklahoma courts' reasons for treating restricted allotments as Indian country must apply with "equal force" to the unrestricted fee lands at issue here, but the Court ultimately admits the two types of land are "legally distinct." *Ante*, at 23, n. 10. And any misstep with regard to the small number of restricted allotments hardly means the Oklahoma courts made the far more extraordinary mistake of failing to notice that the Five Tribes' reservations—encompassing 19 million acres—continued to exist.

lacked "good faith." *Ibid.* In the Court's telling, the federal government acquiesced in this extraordinary alleged power grab, abdicating its responsibilities over the purported reservation. And, all the while, the state and federal courts turned a blind eye.

But we normally presume that government officials exercise their duties in accordance with the law. Certainly the presumption may be strained from time to time in this area, but not so much as to justify the Court's speculations, which posit that government officials at every level either conspired to violate the law or uniformly misunderstood the fundamental structure of their society and government. Whatever the imperfections of our forebears, neither option seems tenable. And it is downright inconceivable that this could occur without prompting objections—from anyone, including from the Five Tribes themselves. Indians frequently asserted their rights during this period. The cases above, for example, involve criminal appeals brought by Indians, and Indians raised numerous objections to land graft in the former Territory. See Brief for Historians et al. as *Amici Curiae* 28–31. Yet, according to the extensive record compiled over several years for this case and a similar case, *Sharp* v. *Murphy*, *post*, p. \_\_\_ (*per curiam*), Indians and their counsel did not raise a single objection to state prosecutions on the theory that the lands at issue were still a reservation. It stretches the imagination to suggest they just missed it.

C

Finally, consider "the subsequent treatment of the area in question and the pattern of settlement there." *Yankton Sioux Tribe*, 522 U. S., at 344. This evidence includes the "subsequent understanding of the status of the reservation by members and nonmembers as well as the United States and the [relevant] State," and the "subsequent demographic history" of the area. *Parker*, 577 U. S., at \_\_\_, \_\_\_ (slip op.,

at 6, 10); see *Solem*, 465 U. S., at 471. Each of the indicia from our precedents—subsequent treatment by Congress, the State's unquestioned exercise of jurisdiction, and demographic evidence—confirms that the Creek reservation did not survive statehood.

First, "Congress' own treatment of the affected areas" strongly supports disestablishment. *Id.*, at 471. After statehood, Congress enacted several statutes progressively eliminating restrictions on the alienation and taxation of Creek allotments, and Congress subjected even restricted lands to state jurisdiction. Since Congress had already destroyed nearly all tribal authority, these statutes rendered Creek parcels little different from other plots of land in the State. See Act of May 27, 1908, 35 Stat. 312; Act of June 14, 1918, 40 Stat. 606; Act of Apr. 10, 1926, 44 Stat. 239. This is not a scenario where Congress merely opened land for "purchase . . . by non-Indians" while allowing the Tribe to "continue to exercise governmental functions over [the] land," *ante*, at 11, and n. 3; rather, Congress eliminated both restrictions on the lands here and the Creek Nation's authority over them. Such developments would be surprising if Congress intended for all of the former Indian Territory to be reservation land insulated from state jurisdiction in significant ways. The simpler and more likely explanation is that they reflect Congress's understanding through the years that "all Indian reservations as such have ceased to exist" in Oklahoma, S. Rep. No. 1232, 74th Cong., 1st Sess., 6 (1935), and that "Indian reservations [in the Indian Territory] were destroyed" when "Oklahoma entered the union," S. Rep. No. 101–216, p. 47 (1989).

That understanding is now woven throughout the U. S. Code, which applies numerous statutes to the land here by extending them to the "*former* reservation[s]" "in Oklahoma"—underscoring that no reservation exists today. 25 U. S. C. §2719(a)(2)(A)(i) (emphasis added) (Indian Gaming

Regulatory Act); see Brief for United States as *Amicus Curiae* 23; 23 U. S. C. §202(b)(1)(B)(v) (road grants; "former Indian reservations in the State of Oklahoma"); 25 U. S. C. §1452(d) (Indian Financing Act; "former Indian reservations in Oklahoma"); §2020(d) (education grants; "former Indian reservations in Oklahoma"); §3103(12) (National Indian Forest Resources Management Act; "former Indian reservations in Oklahoma"); 29 U. S. C. §741(d) (American Indian Vocational Rehabilitation Services Act; "former Indian reservations in Oklahoma"); 33 U. S. C. §1377(c)(3)(B) (waste treatment grants; "former Indian reservations in Oklahoma"); 42 U. S. C. §5318(n)(2) (urban development grants; "former Indian reservations in Oklahoma").[7]

Second, consider the State's "exercis[e] [of] unquestioned jurisdiction over the disputed area since the passage of" the Enabling Act, which deserves "weight" as "an indication of the intended purpose of the Act." *Rosebud Sioux Tribe*, 430 U. S., at 599, n. 20, 604. As discussed above, for 113 years, Oklahoma has asserted jurisdiction over the former Indian

---

[7] The Court suggests that these statutes only show that there are some "former reservations" in Oklahoma, not that the Five Tribes' former domains are necessarily among them. *Ante*, at 27, n. 14. History says otherwise. For example, the Five Tribes actively lobbied for inclusion of this language in the Indian Gaming Regulatory Act. See Hearing on S. 902 et al. before the Senate Select Committee on Indian Affairs, 99th Cong., 2d Sess., 299–300 (1986). They observed that the term "reservation," as originally defined, did not pertain to the "eastern Oklahoma tribes, including the Five Civilized Tribes." *Ibid.* (statement of Charles Blackwell, representative of the Chickasaw Nation of Oklahoma). Accordingly, they "recommend[ed] inclu[ding] . . . the wording 'or in the case of Oklahoma tribes, their *former* jurisdictional and/or reservation boundaries in Oklahoma.'" *Id.*, at 300 (emphasis added). The National Indian Gaming Association, which proposed the language on which the final act was ultimately modeled, made the same point, observing that in Oklahoma "reservation boundaries have been extinguished for most purposes" so the statute should refer to "former reservation[s] in Oklahoma." *Id.*, at 312 (Memorandum from the National Indian Gaming Assn. to the Senate Select Committee on Indian Affairs (June 17, 1986)).

Territory on the understanding that it is not a reservation, without any objection by the Five Tribes until recently (or by McGirt for the first 20 years after his convictions). See Brief for Respondent 4, 40. The same goes for major cities in Oklahoma. Tulsa, for example, has exercised jurisdiction over both Indians and non-Indians for more than a century on the understanding that it is not a reservation. See Brief for City of Tulsa as *Amicus Curiae* 27–28.

All the while, the federal government has operated on the same understanding. Brief for United States as *Amicus Curiae* 24. No less than Felix Cohen, whose authoritative treatise the Court repeatedly cites, agreed while serving as Acting Solicitor of the Interior in 1941 that "all offenses by or against Indians" in the former Indian Territory "are subject to State laws." App. to Supp. Reply Brief for Petitioner in *Carpenter* v. *Murphy*, O. T. 2018, No. 17–1107, p. 1a (Memorandum for Commissioner of Indian Affairs (July 11, 1941)). In the view of the Department of the Interior, such state jurisdiction was appropriate because the reservations in the Territory "lost their character as Indian country" by the time Oklahoma became a State. App. to Brief for United States as *Amicus Curiae* 4a (Letter from O. Chapman, Assistant Secretary of the Interior, to the Attorney General (Aug. 17, 1942)); see also *supra,* at 28, n. 6.

Indeed, far from disputing Oklahoma's jurisdiction, the Five Tribes themselves have repeatedly and emphatically agreed that no reservation exists. After statehood, tribal leaders and members frequently informed Congress that "there are no reservations in Oklahoma." App. to Brief for Respondent 19a (Testimony of Hon. Bill Anoatubby, Governor, Chickasaw Nation, Hearings before the Subcommittee on Indian, Insular and Alaska Native Affairs of the House Committee on Natural Resources (Feb. 24, 2016)).[8] They

---

[8] See App. to Brief for Respondent 18a–19a (excerpting various statements before Congress, including: "[w]e are not a reservation tribe"

took the same position before federal courts. Before this litigation started, the Creek Nation represented to the Tenth Circuit that there is only "'checkerboard' Indian country within its *former* reservation boundaries." Reply Brief in No. 09–5123, p. 5 (emphasis added). And the Nation never once contended in this Court that a sprawling reservation still existed in the more than a century that preceded the present disputes.

Like the Creek, this Court has repeatedly described the area in question as the "former" lands of the Creek Nation. See *Grayson* v. *Harris*, 267 U. S. 352, 353 (1925) (lands "lying within the former Creek Nation"); *Woodward*, 238 U. S., at 285 (lands "formerly part of the domain of the Creek Nation"); *Washington* v. *Miller*, 235 U. S. 422, 423 (1914) (lands "within what until recently was the Creek Nation"). Yet today the Court concludes that the lands have been a Creek reservation all along—contrary to the position shared for the past century by this Court, the United States, Oklahoma, and the Creek Nation itself.

Under our precedent, Oklahoma's unquestioned, century-long exercise of jurisdiction supports the conclusion that no reservation persisted past statehood. See *Yankton Sioux Tribe*, 522 U. S., at 357; *Hagen*, 510 U. S., at 421; *Rosebud Sioux Tribe*, 430 U. S., at 604–605. "Since state jurisdiction over the area within a reservation's boundaries is quite limited, the fact that neither Congress nor the Department of Indian Affairs has sought to exercise its authority over this area, or to challenge the State's exercise of authority is a

———————

(Principal Cherokee Chief, 1982), "Oklahoma, . . . of course, is not a reservation State" (Chickasaw Governor, 1988), "Oklahoma is not [a reservation State]" and "[w]e have no surface reservations in Oklahoma" (Chickasaw advisor, 2011), as well as references to the boundaries and lands of "former reservation[s]" (Chickasaw nominee for Assistant Secretary of Indian Affairs, 2012; Inter-Tribal Council of the Five Civilized Tribes, 2016)).

factor entitled to weight as part of the 'jurisdictional his-
tory.'" *Id.*, at 603–604 (citations omitted).

Third, consider the "subsequent demographic history" of
the lands at issue, which provides an "'additional clue'" as
to the meaning of Congress's actions. *Parker*, 577 U. S., at
___ (slip op., at 10) (quoting *Solem*, 465 U. S., at 472). Con-
tinuing from statehood to the present, the population of the
lands has remained approximately 85%–90% non-Indian.
See Brief for Respondent 43; *Murphy* v. *Royal*, 875 F. 3d
896, 965 (CA10 2017). "[T]hose demographics signify a di-
minished reservation." *Yankton Sioux Tribe*, 522 U. S., at
357. The Court questions whether the consideration of de-
mographic history is appropriate, *ante*, at 18–19, 27, but we
have determined that it is a "*necessary* expedient." *Solem*,
465 U. S., at 472, and n. 13 (emphasis added); see *Parker*,
577 U. S., at ___ (slip op., at 10). And for good reason. Our
precedents recognize that disestablishment cases call for a
wider variety of tools than more workaday questions of stat-
utory interpretation. *Supra*, at 12. In addition, the use of
demographic data addresses the practical concern that
"[w]hen an area is predominately populated by non-Indians
with only a few surviving pockets of Indian allotments, find-
ing that the land remains Indian country seriously burdens
the administration of state and local governments." *Solem*,
465 U. S., at 471–472, n. 12.

Here those burdens—the product of a century of settled
understanding—are extraordinary. Most immediately, the
Court's decision draws into question thousands of convic-
tions obtained by the State for crimes involving Indian de-
fendants or Indian victims across several decades. This in-
cludes convictions for serious crimes such as murder, rape,
kidnapping, and maiming. Such convictions are now sub-
ject to jurisdictional challenges, leading to the potential re-
lease of numerous individuals found guilty under state law

of the most grievous offenses.[9]  Although the federal government may be able to reprosecute some of these crimes, it may lack the resources to reprosecute all of them, and the odds of convicting again are hampered by the passage of time, stale evidence, fading memories, and dead witnesses. See Brief for United States as *Amicus Curiae* 37–39.  No matter, the court says, these concerns are speculative because "many defendants may choose to finish their state sentences rather than risk reprosecution in federal court." *Ante*, at 38.  Certainly defendants like McGirt—convicted of serious crimes and sentenced to 1,000 years plus life in prison—will not adopt a strategy of running out the clock on their state sentences.  At the end of the day, there is no escaping that today's decision will undermine numerous convictions obtained by the State, as well as the State's ability to prosecute serious crimes committed in the future.

Not to worry, the Court says, only about 10%–15% of Oklahoma citizens are Indian, so the "majority" of prosecutions will be unaffected.  *Ibid.*  But the share of serious crimes committed by 10%–15% of the 1.8 million people in eastern Oklahoma, or of the 400,000 people in Tulsa, is no small number.

Beyond the criminal law, the decision may destabilize the governance of vast swathes of Oklahoma.  The Court, despite briefly suggesting that its decision concerns only a narrow question of criminal law, ultimately acknowledges that "many" federal laws, triggering a variety of rules, spring into effect when land is declared a reservation. *Ante*, at 39–40.

---

[9]The Court suggests that "well-known" "procedural obstacles" could prevent challenges to state convictions. *Ante*, at 38.  But, under Oklahoma law, it appears that there may be little bar to state habeas relief because "issues of subject matter jurisdiction are never waived and can therefore be raised on a collateral appeal." *Murphy* v. *Royal*, 875 F. 3d 896, 907, n. 5 (CA10 2017) (quoting *Wallace* v. *State*, 935 P. 2d 366, 372 (Okla. Crim. App. 1997)).

State and tribal authority are also transformed.  As to the State, its authority is clouded in significant respects when land is designated a reservation.  Under our precedents, for example, state regulation of even non-Indians is preempted if it runs afoul of federal Indian policy and tribal sovereignty based on a nebulous balancing test.  This test lacks any "rigid rule"; it instead calls for a "particularized inquiry into the nature of the state, federal, and tribal interests at stake," contemplated in light of the "broad policies that underlie" relevant treaties and statutes and "notions of sovereignty that have developed from historical traditions of tribal independence."  *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 142, 144–145 (1980).  This test mires state efforts to regulate on reservation lands in significant uncertainty, guaranteeing that many efforts will be deemed permissible only after extensive litigation, if at all.[10]

In addition to undermining state authority, reservation status adds an additional, complicated layer of governance over the massive territory here, conferring on tribal government power over numerous areas of life—including powers over non-Indian citizens and businesses.  Under our precedents, tribes may regulate non-Indian conduct on reservation land, so long as the conduct stems from a "consensual

---

[10] See, *e.g.*, *White Mountain Apache Tribe*, 448 U. S., at 148–151 (barring State from imposing motor carrier license tax and fuel use taxes on non-Indian logging companies that harvested timber on a reservation); *Warren Trading Post Co.* v. *Arizona Tax Comm'n*, 380 U. S. 685, 690–692 (1965) (barring State from taxing income earned by a non-Indian who operated a trading post on a reservation); *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324, 325 (1983) (barring State from regulating hunting and fishing by non-Indians on a reservation); see also *Brendale* v. *Confederated Tribes and Bands of Yakima Nation*, 492 U. S. 408, 448 (1989) (opinion of Stevens, J.) (arguing that it is "impossible to articulate precise rules that will govern whenever a tribe asserts that a land use approved by a county board is pre-empted by federal law").

relationship[] with the tribe or its members" or directly affects "the political integrity, the economic security, or the health or welfare of the tribe." *Montana* v. *United States*, 450 U. S. 544, 565–566 (1981); see Cohen §6.02(2)(a), at 506–507. Tribes may also impose certain taxes on non-Indians on reservation land, see *Kerr-McGee Corp.* v. *Navajo Tribe*, 471 U. S. 195, 198 (1985), and in this litigation, the Creek Nation contends that it retains the power to tax non-members doing business within its borders. Brief for Muscogee (Creek) Nation as *Amicus Curiae* 18, n. 6. No small power, given that those borders now embrace three million acres, the city of Tulsa, and hundreds of thousands of Oklahoma citizens. Recognizing the significant "potential for cost and conflict" caused by its decision, the Court insists any problems can be ameliorated if the citizens of Oklahoma just keep up the "spirit" of cooperation behind existing intergovernmental agreements between Oklahoma and the Five Tribes. *Ante*, at 41. But those agreements are small potatoes compared to what will be necessary to address the disruption inflicted by today's decision.

The Court responds to these and other concerns with the truism that significant consequences are no "license for us to disregard the law." *Ibid.* Of course not. But when those consequences are drastic precisely because they depart from how the law has been applied for more than a century—a settled understanding that our precedents demand we consider—they are reason to think the Court may have taken a wrong turn in its analysis.

\*　\*　\*

As the Creek, the State of Oklahoma, the United States, and our judicial predecessors have long agreed, Congress disestablished any Creek reservation more than 100 years ago. Oklahoma therefore had jurisdiction to prosecute McGirt. I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

———————

No. 18–9526

———————

## JIMCY McGIRT, PETITIONER *v.* OKLAHOMA

ON WRIT OF CERTIORARI TO THE COURT OF CRIMINAL
APPEALS OF OKLAHOMA

[July 9, 2020]

JUSTICE THOMAS, dissenting.

I agree with THE CHIEF JUSTICE that the former Creek Nation Reservation was disestablished at statehood and Oklahoma therefore has jurisdiction to prosecute petitioner for sexually assaulting his wife's granddaughter. *Ante*, at 1–2 (dissenting opinion). I write separately to note an additional defect in the Court's decision: It reverses a state-court judgment that it has no jurisdiction to review. "[W]e have long recognized that 'where the judgment of a state court rests upon two grounds, one of which is federal and the other non-federal in character, our jurisdiction fails if the non-federal ground is independent of the federal ground and adequate to support the judgment.'" *Michigan* v. *Long*, 463 U. S. 1032, 1038, n. 4 (1983) (quoting *Fox Film Corp.* v. *Muller*, 296 U. S. 207, 210 (1935)). Under this well-settled rule, we lack jurisdiction to review the Oklahoma Court of Criminal Appeals' decision, because it rests on an adequate and independent state ground.

In his application for state postconviction relief, petitioner claimed that Oklahoma lacked jurisdiction to prosecute him because his crime was committed on Creek Nation land and thus was subject to the exclusive jurisdiction of the Federal Government under the Major Crimes Act, 18 U. S. C. §1153. In support of his argument, petitioner cited the Tenth's Circuit's decision in *Murphy* v. *Royal*, 875 F. 3d 896 (2017).

The Oklahoma Court of Criminal Appeals concluded that petitioner's claim was procedurally barred under state law because it was "not raised previously on direct appeal" and thus was "waived for further review." 2018 OK CR 1057 ¶2, ___ P. 3d ___, ___ (citing Okla. Stat., Tit. 22, §1086 (2011)). The court found no grounds for excusing this default, explaining that "[p]etitioner [had] not established any sufficient reason why his current grounds for relief were not previously raised." ___ P. 3d, at ___. This state procedural bar was applied independent of any federal law, and it is adequate to support the decision below. We therefore lack jurisdiction to disturb the state court's judgment.

There are two possible arguments in favor of jurisdiction, neither of which hold water. First, one might claim that the state procedural bar is not an "adequate" ground for decision in this case. In *Murphy*, the Tenth Circuit suggested that Oklahoma law permits jurisdictional challenges to be raised for the first time on collateral review. 875 F. 3d, at 907, n. 5 (citing *Wallace* v. *State*, 1997 OK CR 18, 935 P. 2d 366). But the Oklahoma Court of Criminal Appeals did not even hint at such grounds for excusing petitioner's default here. More importantly, however, we may not go beyond "the four corners of the opinion" and delve into background principles of Oklahoma law to determine the adequacy of the independent state ground. *Long*, 463 U. S., at 1040. This Court put an end to that approach in *Long*, noting that "[t]he process of examining state law is unsatisfactory because it requires us to interpret state laws with which we are generally unfamiliar, and which often, as in this case, have not been discussed at length by the parties." *Id.*, at 1039. Moreover, such second-guessing disrespects "the independence of state courts," *id.*, at 1040, and the State itself, *Coleman* v. *Thompson*, 501 U. S. 722, 738–739 (1991).

Second, one might argue, as the Court does, that we have jurisdiction because the decision below rests on federal, not state, grounds. See *ante,* at 38, n. 15. It is true that the

Oklahoma Court of Criminal Appeals briefly recited the procedural history of *Murphy* and recognized that the Tenth Circuit's decision—which we granted certiorari to review—is not yet final. But contrary to the Court's assertion that brief discussion of federal case law did not come close to "address[ing] the merits of [petitioner's] federal [Major Crimes Act] claim." *Ante*, at 38, n. 15. The state court did not analyze the relevant statutory text or this Court's decisions in *Solem* v. *Bartlett*, 465 U. S. 463 (1984), and *Nebraska* v. *Parker*, 577 U. S. 481 (2016). It reads far too much into the opinion to claim that the court's brief reference to the Tenth Circuit's decision in *Murphy* transformed the state court's decision into one that "fairly appear[s] to rest primarily on federal law or to be interwoven with federal law," *Long, supra*, at 1040–1041; see also *ante,* at 38, n. 15. Nothing in the court's opinion suggests that its judgment was at all based on federal law. Thus, even if we were to set aside the fact that the state court "clearly and expressly state[d] that [its decision] was based on state procedural grounds," we could not presume jurisdiction here. *Coleman, supra*, at 735–736 (internal quotation marks omitted).

The Court might think that, in the grand scheme of things, this jurisdictional defect is fairly insignificant. After all, we were bound to resolve this federal question sooner or later. See *Royal* v. *Murphy*, 584 U. S. ___ (2018). But our desire to decisively "settle [important disputes] for the sake of convenience and efficiency" must yield to the "overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere." *Hollingsworth* v. *Perry*, 570 U. S. 693, 704–705 (2013) (internal quotation marks omitted). Because the Oklahoma court's "judgment does not depend upon the decision of any federal question[,] we have no power to disturb it." *Enterprise Irrigation Dist.* v. *Farmers Mut. Canal Co.*, 243 U. S. 157, 164 (1917).

I agree with THE CHIEF JUSTICE that the Court misapplies our precedents in granting petitioner relief. *Ante*, at 6–38 (dissenting opinion). But in doing so, the Court also overrides Oklahoma's statutory procedural bar, upsetting a violent sex offender's conviction without the power to do so. The State of Oklahoma deserves more respect under our Constitution's federal system. Therefore, I respectfully dissent.